# HENRY COUNTY v. SALMON et al.; GAINES et al., Sureties, Appellants.

### In Banc, February 22, 1907.

1. **ENTRIES NUNC PRO TUNC: County Court.** The inherent power of a county court, being a court of record, to supply .entries *nunc pro tunc* which have been omitted through the misprision of its clerk, where sufficient data exists in the clerk's office, does not depend on statute, but is a necessary incident to the jurisdiction of every court of record.

2. ———: ———: **Judge's Memorandum: County Depositary: Approval of Bond.** A bond of the county depositary . was dated May 4, 1903, and there was a memorandum of its filing on May 7th, and on the back of the bond there was a memorandum of its approval, under date of June 1, 1903, certified by the presiding judge, during the session of the court. *Held*, that this memorandum may be considered a minute of the court's action, and authorized a *nunc pro tunc* order, approving the bond, made in September, 1905; especially, as there was· an order made on May 4, 1903, designating the bank as depositary on condition that it file a bond and that the same be approved, which, though being premature, was evidence of the intendment of the court to approve it.

3. ———: County Depositary: Bond: Approval: Within Five Days. The statute does not say that the depositary's bond must be approved in five days. It says it must be executed within five days—that is, signed and delivered.

4. COUNTY DEPOSITARY: Bond: Rigid Statutory Requirements. A rigid compliance with all the *minutiae* of the statute is not indispensable to the validity of a depositary bond. Immaterial variance from statutory form will not render it invalid.

5. ———: ———: Lack of Approval: Validity. Where the bond itself designated a certain bank as county depositary, and that bank, on the filing of the bond and its approval by the county court, assumed to act as county depositary and received the county moneys, the sureties, when sued on the bond, cannot escape liability by a showing that no order approving the bond was ever entered of record. Under such circumstances it is immaterial whether or not there was any formal order designating the bank as depositary. Such order not being intended for the benefit of the sureties, but of the public, the case falls within the rule that the sureties on an official bond, by virtue of which the officer has been inducted into office, cannot, when called upon to answer for his official defaults, escape liability upon the ground that their principal was not duly elected, or did not legally qualify.

6. STATUTORY CONSTRUCTION: Purposes to be Conserved: Judicial Notice. In expounding legislation, it is permissible for courts to consider the mischiefs to be retarded and the benefits to be advanced thereby. To that end, they may assume a knowledge of the events of current public history; for courts should not proceed on the theory that they do not know what every one else does know.

7. ———: ———: County Depositary. The purpose of the law which requires county treasurers to deposit the county moneys in banks making the highest bids therefor was not that such funds might be kept as a special deposit, but that the depositary should use them by loaning them, and pay the county for such use. But that was not to be an unlimited use, for in order that the county might be protected, a depositary bond was required, guaranteeing, in substance and effect, that the depositary bank should pursue such a safe method of banking as would result in paying the treasurer's checks on presentation and demand according to the course of banks.

8. COUNTY DEPOSITARY: Reading Statute Into Bond. To get at the scope of a bond given by a county depositary, when suit is brought on the bond, the statute pertaining to the subject-

matter of county depositaries should be read into the bond, and the sureties are to be held to have contracted with a view to those statutes. This does not militate against the rule that the obligation of a surety is not to be enlarged by implication, and that sureties are favorites of the law and are entitled to stand on the terms of the bond strictly construed.

9. ———: **Relation of Depositary and Sureties to County: Losses.** The relation between the county depositary and the county is that of debtor and creditor; and the depositary's bond is not, in a strict sense, an official bond. Nor does the depositary occupy the relation of a public officer having charge of public funds, which he may not use. On the contrary, when the money of the county passes into the hands of the depositary it becomes, in legal effect, the depositary's money, subject to its use in banking; it becomes indebted to the county, and its sureties become sponsors for the payment of the debt on demand, in the time and manner contemplated by statute. If losses occur, in the eyes of the law they are losses of the funds of the bank, not of the county, and the sureties are to be held as having contracted against those losses or to pay the debt. The law applicable to suits on official bonds which requires that the conversion of the funds be shown to have occurred during the term of the bond, is not pertinent in a suit on the depositary's bond.

10. ———: **Liability of Bondsmen: Date of Loss.** It is no defense to a suit on the county depositary's bond, that the loss occurred under some depositary bond given by other parties prior to the signing of the bond sued on, if at the time the bond sued on was given the depositary was indebted to the county and was indebted to it when the treasurer's checks were presented, and payment was not made.

11. ———: ———: ———: **Payments.** Nor is it any defense that the depositary, during the term of the bond, made payments, with its own money, on its indebtedness to the county, amounting in the aggregate to more than the amount of the new indebtedness which it contracted on the same account during the same time. Where there was a continuous debt from the depositary to the county during the life of the bond sued on and of the prior bond, and the payments come into the trial unapplied, the law applies them according to right and justice, that is, to the debt, if the deficiency of the depositary, occurring during the life of the prior bond, is brought down to within the life of the bond in suit.

12. ———: ———: ———: **Prior Deficiencies: Bank Credits: No Actual Money.** It does not lie in the mouth of the sureties,

when sued on the depositary's bond, to contend that the money sued for was due the county when the bond was made, that the county funds had already been lost and then existed only as credits on the bank's books, and that the treasurer did not in fact ever receive the money, but only the bank's pass-book showing the bank owed the county a certain sum, and that moneys to the amount which the treasurer has since then placed in the hands of the depositary had been paid on presentation of the treasurer's checks. They cannot complain that the transfers were made in a manner common to the banking business.

13. ———: ———: ———: ———: **What Is the Res.** The *res*, in a suit on the county depositary's bond, is the assumption by the depositary of liability to the county for debt—the establishing of the relation of a debtor and a creditor; and that liability is a continuous and transmitted liability from end to end of the transaction. When the money is called for and is not paid, the liability becomes fixed, no matter whether the deficiency first occurred before the bond was made, or afterwards.

14. ———: ———: ———: **Funds Never Turned Over to Depositary.** Prior to the time the principal in the bond sued on became county depositary, it had acquired the properties of another bank, which was at the time county depositary, and assumed all its liabilities, and the county funds were never actually turned over to the assignee, but were credited by it to the county on its bank books. *Held*, that the sureties on the depositary's bond cannot escape liability on the ground that the county funds were lost by the prior depositary, for their principal agreed to pay that debt.

15. ———: **Treasurer's Shortage.** The depositary's sureties are not liable for a shortage of the county treasurer which was attempted to be shouldered off of his official bondsmen on to them, by the treasurer giving his note to the depositary bank for the amount of the shortage, and the depositary adding that amount to the county's credits on its books, the note in fact never having been paid, and the money the note called for having not in fact been deposited as county money by the treasurer with the county depositary.

16. **APPELLATE PRACTICE: Entering Right Judgment.** The Supreme Court, under its statutory power, will enter the judgment the trial court should have entered in a suit on a county depositary's bond.

Appeal from Greene Circuit Court.—*Hon James T. Neville*, Judge.

Henry County v. Salmon.

AFFIRMED IN PART AND REVERSED IN PART.

*C. C. Dickinson, Parks & Son, C. A. Calvird* and *A. B. Lovan* for appellants.

(1) The contract of a surety must receive a strict construction and cannot be extended beyond the fair scope of its terms. Blair v. Ins. Co., 10 Mo. 559; Fisse v. Emstein, 5 Mo. App. 78. The liability of a surety cannot be extended by implication beyond the plain terms of his contract. State ex rel. v. Sandusky, 46 Mo. 377; Leavel v. Porter, 52 Mo. 632; Erath v. Allen, 55 Mo. App. 107; State ex rel. v. Weeks, 92 Mo. App. 359. A surety is the favorite of the law and has the right to stand on the strict terms of his obligation. Springfield Lighting Co. v. Hobart, 98 Mo. App. 227. (2) (a) To constitute a deposit, there must be a delivery of the *res* to the depositary. 13 Ency. Law & Proc., 795. (b) The deposit is complete upon the delivery of the *res*. 13 Ency. Law & Proc., 798. (c) Where a public officer is required by statute to deposit the public moneys in some bank, his mere designation of a bank as depositary confers no obligation nor any right upon such bank in relation thereto until the money is actually deposited with and accepted by it. Lewis v. Park Bank, 2 Daly 85. (d) A designation by the chamberlain of the city of New York, of the bank which is to be the depositary of funds which he may receive in his official capacity, does not confer any right on the bank, and entitle it to an action for damages against another bank which held the funds under an adverse claimant of the office of chamberlain, pending litigation as to the title to the office, since it has no responsibility for or right to any other moneys than such as should be actually placed in its charge. Lewis v. Park Bank, 42 N. Y. 463, affirming 2 Daly 85, which affirms 30 How. Prac. 115, 2 Abb. Prac. 93. (e) In Brown v. Wyandotte County, 58 Kan. 672, it is said: "The county was a general depositor

of funds and by the act of deposit the reciprocal relation of debtor and creditor arose.'' (3) County depositary is *pro hac vice* a public officer, and its bond is to the public, and an action thereon is to be governed by rules applicable to official bonds. Board of Comrs. v. Bank, 75 Minn. 174; Board of Comrs. v. Bank, 66 N. W. 145. (4) The general rule is that sureties on an official bond are only liable for breaches occurring after the execution of the bond, and are not liable for prior defaults unless made so by the terms of the bond. State ex rel. v. Finn, 98 Mo. 532; State ex rel. v. McCormack, 50 Mo. 570; State ex rel. v. Branch, 151 Mo. 637; State ex rel. v. Elliott, 157 Mo. 609. (5) (a) If neither party makes the application, it devolves upon the court, and will be exercised justly and equitably. Beck v. Hass, 111 Mo. 268; Estes v. Fry, 166 Mo. 85; Ganther v. Kempner, 58 Mo. 570; McCuen v. Belt, 45 Mo. 181; Milan v. Grayston, 83 Mo. App. 425; Goetz v. Piel, 26 Mo. App. 634; Littleton v. Harris, 69 Mo. App. 596; Poulson v. Collier, 18 Mo. App. 583. (b) In the application of payments the rule that they should go to pay the oldest item of account does not apply as against the different sets of sureties on successive bonds of public officers. State ex rel. v. Collector, 8 Mo. 395; State ex rel. v. Smith, 26 Mo. 226; State ex rel. v. Alsup, 91 Mo. 172; U. S. v. January, 7 Cranch 572; U. S. v. Eckford Exrs., 1 How. 263; Mechem on Public Officers (1890), sec. 291; Rogers v. State, 99 Ind. 218; Pine Com. v. Willard, 39 Minn. 125; Chapman v. Commonwealth, 25 Gratt. 721; State v. Sooy, 39 N. J. L. 539; Pickering v. Day, 3 Houst. 474; 1 Brandt on Suretyship (3 Ed.), sec. 372; Myers v. United States, 1 McLean 493; Stone v. Seymore, 15 Wend. 19. (c) As between sureties the rule that payments on even a current account must be applied to the oldest item does not apply. Drake v. Sherman, 179 Ill. 362. (6) (a) Where a collecting officer, who is in default for a prior term, properly pays over in a subsequent term, according to this bond, money re-

ceived during that term, the government officers cannot, even with the consent of the collector, apply the money so received upon the defalcation of the previous term, and, by thus creating an apparent deficit at the end of the subsequent term, hold the sureties for that term liable for it. U. S. v. Irving, 1 How. 250; U. S. v. January, 7 Cranch 572; Jones v. United States, 7 How. 688; Pickering v. Day, 3 Houst. 474; Boring v. Williams, 17 Ala. 525; Porter v. Stanley, 47 Me. 518; Myers v. United States, 1 McLean 495; State v. Middleton, 57 Tex. 185. (b) The law itself will apply the payments, for the statute, governing the application of public moneys, is mandatory in the requirement that current funds must be applied to the discharge of current expenses. Secs. 6771-6780, R. S. 1899; Andrew Co. ex rel. v. Schell, 135 Mo. 31.

*James D. Lindsay* for respondent.

(1) The bond is in compliance with the statute. Secs. 6820, et seq. R. S. 1899. And is binding upon all who signed it. Wimpey v. Evans, 84 Mo. 144; Newton v. Cox, 76 Mo. 352; State to use v. Cameron, 12 Mo. 376; Graves v. McHugh, 58 Mo. 499; State ex rel. v. O'Gorman, 75 Mo. 370; James v. Dixon, 21 Mo. 538. And the *nunc pro tunc* order was proper. Farley Bros. v. Camman, 43 Mo. App. 168; Evans v. Fisher, 26 Mo. App. 546; Turner v. Benoist, 5 Mo. 145; Massey v. Scott, 49 Mo. 278; Mann v. Schroer, 50 Mo. 306. (2) The making of the bond, and the deposit of money thereunder, constituted Salmon & Salmon a depositary, *de facto*. Board of Commissioners v. Gray (Minn), 63 N. W. 635; Board of Commissioners v. American Loan & Trust Company (Minn.), 69 N. W. 704, 78 N. W. 113; In re State Treasurer's Settlement (Neb.), 70 N. W. 532; Board of Commissioners of Hennepin County v. State Bank (Minn.), 66 N. W. 143. (3) The relation between a county depositary and the county is that of debtor

and creditor. The money, checks or other credits deposited by the county with its depositary become, *eo instanti,* the property of the depositary, and cease to be the property of the county. They do not constitute a trust fund, but a general deposit. Brown v. Board of Commissioners of Wyandotte County (Kas.), 50 Pac. 888; Myers v. Board of Commissioners of Kiowa County (Kas.), 56 Pac. 11; Board of Commissioners of St. Louis County v. American Loan & Trust Co. (Minn.), 78 N. W. 113; Hall County v. Thomssen (Neb.), 89 N. W. 393; In re State Treasurer's Settlement (Neb.), 70 N. W. 532; McNulta v. West Chicago Park Commissioners, 99 Fed. 900; Branch v. United States, Thompson Nat'l Bank Cases, 363, 12 Bank Magazine, 61; Morse on Banks and Banking (3 Ed.), part 11, 145. (4) The bond being conditioned as provided by statute, it is to be construed as though all the provisions of the statute concerning county depositaries were contained in it. Campbell v. Harrington, 93 Mo. App. 325; State ex rel. v. Rubber Mfg. Co., 149 Mo. 212. (5) Two legal results flow from the deposit of money or credits with a banker: First. It creats the relation of debtor and creditor. Kenneth Investment Co. v. National Bank of the Republic, 96 Mo. App. 125; Arnold v. Sedalia National Bank, 100 Mo. App. 474; O'Grady v. Stotts City Bank, 106 Mo. App. 366. Second. It lays upon the banker the duty of honoring, upon presentation, checks drawn by the depositor upon his bank, within the limits of the indebtedness existing under the relation, and makes the banker liable to respond in compensatory damages for failure to do so. This was, and is, the common law. Zane on Banks and Banking (1 Ed.), sec. 128; O'Grady v. Stotts City Bank, 106 Mo. App. 366; First National Bank v. Shoemaker, 117 Pa. 94. The statute of this State concerning county depositaries is a legislative declaration of the foregoing common law rules, in their application to the relation between a county and a county depositary. The bond is re-

quired to secure the performance of the obligations created by the relation, which obligations are identical with those above referred to.    (6) The object in requiring such a bond as is sued on in this action was not the safe keeping of a deposit, in specie, nor the preservation of a trust fund, nor protection against defalcations or conversions of moneys by an agent or officer, but it was to secure to the county the payment of an indebtedness accruing to it from the depositary, and to secure the payment of damages to any one injured by a breach of its obligation to pay checks so long as the depositary stood indebted to the county.    Brown v. Board of Commissioners of Wyandotte County (Kan.), 50 Pac. 888; Myers v. Board of Commissioners of Kiowa County (Kan.), 56 Pac. 11; In re State Treasurer's Settlement (Neb.), 70 N. W. 532; Board of Commissioners of Redwood County v. Citizens' Bank (Minn.), 69 N. W. 912.    (7) This liability of sureties on a depositary bond accrues where the depositary, at the time of the approval of the bond, already bore the relation to the county, and was already indebted to the county; and the insolvency of the depositary, before or at the time of the making of the bond is immaterial, so far as concerns the liability of the sureties.    Board of Commissioners of St. Louis County v. American Loan & Trust Co., 78 N. W. 113; People v. Shepard, 55 N. Y. Supp. 1130; Board of Commissioners of Redwood County v. Citizens' Bank (Minn.), 69 N. W. 912; Myers v. Board, 56 Pac. 11; Brown v. Board, 58 Kan. 72.    (8) The act concerning county depositaries contemplated the use of checks and credits, in the usual and ordinary manner of doing business with banks.    Secs. 6821, 6824, 6825 and 6826, R. S. 1899.    The acts, therefore, of the various county treasurers, beginning with Pinkston, in making the transfer from one bank to the other or from one treasurer to his successor, by means of checks and credits on the books, was the usual and ordinary way of transacting business of that kind.    But,

conceding that it was the duty of the various treasurers
to do the extraordinary thing of demanding the actual
currency to be handed out, yet that can avail the de-
fendants nothing.  It is the unvarying rule that sure-
ties upon the bond of a public officer or of a public de-
pository cannot escape liability upon the ground that
the default was due to the act, delinquency or omission
of some other officer of the government.   Throop on
Public Officers, secs. 281-286; Mathis v. Morgan, 72 Ga.
517; Blair v. Anderson, 121 Ga. 120, 2 Am. and Eng.
Ann. Cases, 165; Ray County v. Bentley, 49 Mo. 236;
Marion County v. Moffett, 15 Mo. 604; Parker v. State,
7 Mo. 194.  (9) The drawing and presentation of checks
by the treasurers, and the acceptance of the same by
Salmon & Salmon, and giving credit on their books, was
the same in legal effect, so far as they and their sureties
were concerned, as though the money had been paid out
on the check and then deposited again.   Morse on
Banks and Banking (3 Ed.), sec. 451; Zane on Banks
and Banking, sec. 133; Oldie v. National City Bank, 45
N. Y. 735; American Exchange National Bank v.
Gregg, 138 Ill. 596; Bank v. Burkhart, 100 U. S. 686;
Bartley v. State (Neb.), 73 N. W. 744; National Bank
v. Burns, 68 Ala. 267.  And this is true notwithstanding
the bank was insolvent.   The insolvency is immaterial.
Montgomery County v. Cochrane, 126 Fed. 456; Peo-
ple v. Shepard, 55 N. Y. Supp. 1130.    (10) Payments
made by Salmon & Salmon upon the running, current
account between them and the county will be applied by
the law, upon the items first maturing.  Goetz v. Piel,
26 Mo. App. 634; McCune v. Belt, 45 Mo. 174; Price v.
Merrit, 55 Mo. App. 640; Keen v. Watson, 39 Mo. App.
165; Board of Commissioners v. Citizens' Bank
(Minn), 69 N. W. 912; Board of Commissioners v.
American Loan & Trust Company (Minn.), 78 N.
W. 113.  And this is true although sureties are
concerned.   The surety assumes the obligation

of his principal, and the rule which determines the liability of the principal also determines the liability of the surety. Goetz v. Piel, supra; Turner v. Yates, 57 U. S. 14; Allen v. Colver, 3 Denio 284; Pope v. Transportation Co., 91 Vt. 79; Robson v. McKoin, 18 La. Ann. 544.

LAMM, J.—The suit is against Salmon & Salmon as principal and the sureties on a county depositary bond alleged to have been executed in the penal sum of $200,000 to the county of Henry in this State. Begun in the circuit court of Henry county by attachment, the case went on change of venue to the circuit court of Greene county. Answers were filed by three of the sureties—Adamson, Adair and Gaines. By stipulation the issues on the attachment were to abide the finding on the merits.

At a trial before the Honorable James T. Neville, Judge of the Greene Circuit Court, without the aid of a jury, the issues were found for plaintiff, the attachment sustained, damages assessed at the sum of $63,000, and judgment rendered for the penal sum of the bond to be satisfied by the payment of said damages with interest at six per cent.

From that judgment, on due preliminary steps, defendants Gaines, Adamson and Adair appeal.

The bond, with indorsements, is as follows:

"Know all men by these presents, that we, Salmon & Salmon, a copartnership, composed of G. Y. Salmon and H. W. Salmon, bankers of Clinton, Missouri, as principals, and G. M. Casey, G. Y. Salmon, C. W. Gaines, W. W. Adamson, Wm. Adair, J. R. Barker and H. W. Salmon, as sureties, hereby acknowledge ourselves to owe and stand indebted to the county of Henry in the State of Missouri, in the full sum of two hundred thousand dollars for the payment of which well and truly to be made we bind ourselves, our heirs, executors,

administrators and assigns by these presents; signed and dated this 4th day of May, A. D. 1903.

"The condition of the above obligation is such that whereas the said Salmon & Salmon, bankers of Clinton, Missouri, were on the 4th day of May, 1903, said day being the 1st day of the regular May term, 1903, of the said county court of the said county of Henry aforesaid, selected as the county depositary of said Henry county upon and in consideration of a bid of two and one-third per cent interest per annum upon the daily balances of all money said Henry county shall have on deposit with said Salmon & Salmon, bankers of Clinton, Missouri, payable monthly, the same being the highest and best bid of interest for the said money, for the term of two years next ensuing after the said 4th day of May, 1903, and until sixty days after the time fixed by law for another selection as provided by article six of chapter ninety-seven of the Revised Statutes of Missouri, 1899, entitled, 'County Depositary.'

"Now, if the said Salmon & Salmon, bankers of Clinton, Missouri, shall faithfully perform all the duties and obligations devolving by law upon them as such depositary and shall pay upon presentation all checks drawn upon them by the county treasurer of said Henry county whenever any funds shall be in said depository and shall faithfully keep all funds of said county, including funds belonging to school districts in the said county of Henry, and shall account for the same according to law, then this obligation shall be void, and of no effect, otherwise to remain in full force and effect.                SALMON & SALMON,

G. M. CASEY,

G. Y. SALMON,

C. W. GAINES,

W. W. ADAMSON,

WILLIAM ADAIR,

J. R. BARKER,

H. W. SALMON.

"Filed May 7, 1903.

"Harry A. Stewart, County Clerk.

"Approved this 1st day of June, 1903.

"JOSEPH F. BOYD, Presiding Judge."

The petition counts on the theory that notice was published for bids; that bids were received and opened, and that of the banking firm of Salmon & Salmon accepted on the first day of the regular May term, 1903, of the county court of Henry county, whereby that firm of bankers offered to pay two and one-third per cent per annum upon the daily balances of all moneys plaintiff had on deposit, and was selected as county depositary. Thereupon the foregoing bond was executed and was approved in due time, and Salmon & Salmon was designated as (and became) the county depositary of Henry county to receive and hold all the funds belonging to said county for a period of two years and as provided by law.

The breaches assigned are that said bankers failed and refused to pay upon presentation all the checks drawn upon them by the county treasurer of Henry county, Missouri, upon the funds kept in said depositary; that Salmon & Salmon failed to faithfully keep all the funds of said county, including the funds belonging to the school districts, and failed to faithfully account for the same as by law and the terms of the said bond they were required to do; and that on the 20th day of June, 1905, by reason of Salmon & Salmon being insolvent and in a failing condition, their said bank was taken in charge by the Secretary of State, and is no longer a going concern.

The answer of Adamson, Gaines and Adair is as follows:

"Come again the defendants W. W. Adamson, C. W. Gaines and Wm. Adair, and for their joint and several answer to plaintiff's amended petition in this cause, admit that they signed the instrument of writing sued on; admit the co-partnership and insolvency

of Salmon & Salmon; deny each and every other allegation contained in said amended petition; and aver that whatever loss, if any, of plaintiff's fund accrued and whatever damage, if any, accrued to plaintiff under some depositary bond given prior to the signing of the instrument sued on and given by other parties than these defendants and having fully answered these defendants pray to go hence with their costs.''

The replication tendered the general issue on the affirmative matter in the answer.

It having been represented to us by counsel that this suit involves, not only the general funds of Henry county, but the current funds of public schools and road districts as well, and that present determination was of high importance to all the people of that county, we passed an order, *ex gratia,* that the case be taken from its place at the foot of the general docket, advanced and set down for speedy hearing. In addition to oral arguments, this court is much beholden to learned counsel on both sides for full briefs—in tone, commendable; in style, lucid; in matter, weighty and apposite.

Such facts as are deemed vitally necessary to an understanding and determination of questions raised will appear in connection with the consideration of the several assignments of error.

I.   Sections 6819, 6820 and 6821 of article 6 of chapter 97, of Revised Statutes 1899, relating to ''County Depositary,'' were repealed by the Forty-first General Assembly (Laws 1901, pp. 101, 102) and new sections bearing the same numbers were enacted. The present section 6821, as did the old one of that number, contemplates that an order shall be made by the county court, after it approves the bond, in terms designating the successful bidder as county depositary.

When the proof went in below it appeared that the

records of the county court of Henry county set forth the advertisement for bids in one order. In a later order are set forth the receipt of bids, the opening of bids, the terms of the same, a recital that the bid of Salmon & Salmon was the highest, and further set forth as follows: ". . . It is hereby ordered that the bank of Salmon & Salmon be made depositary bank of Henry county, and within five days after this order and selection said Salmon & Salmon shall execute a bond payable to said Henry county, to be approved by this court and filed in the office of the clerk of the court," etc. (Here follows the number and qualifications of the required sureties and the terms of the bond.)

The foregoing order was made May 4th, 1903, and it seems that a formal record entry approving the bond and thereafter designating said individual bankers as county depositary, was not entered of record until 1905. In September, 1905, and after Salmon & Salmon had failed, Mr. Hinkle, prosecuting attorney of the county, on the theory the omissions were due to clerical inadvertence, presented an application to the county court for a *nunc pro tunc* entry to cover them, and one was made approving the bond and making the formal designation of Salmon & Salmon as county depositary.

An examination of the bond will show that an attempt was made to follow the terms of article 6 of chapter 97, *supra,* overlooking the changes in the law made in 1901. For instance, the term fixed by the bond for the life of the depositary is two years and sixty days, while by the present section 6821 the term, when read with the other sections, is fixed at two years and sixty-five days.

Based on the fact that the bond runs for two years and sixty days instead of for two years and sixty-five days, on the further fact that the bond was not approved within five days from the time of its filing, and on

the further contention that the *nunc pro tunc* entry approving the bond and designating Salmon & Salmon as depositary was improvidently made, and is of no force, and, therefore, that there is no order designating Salmon & Salmon as depositary, as required by statute, it was contended below by defendant's learned counsel that plaintiff must be cast.    In justice to counsel it should be said that such contentions here do not rise to the dignity of an assignment of error, nor are they so designated in their brief.    They were addressed to us *ore tenus,* and may be found in their brief rather as criticisms or hostile suggestions, or matters raising a substantial doubt, than as a formal assignment of error.

However raised, we shall look into these contentions for substance—the subject-matter of litigation being eminently grave.

In the first place, a county court is a court of record.   [R. S. 1899, sec. 1580.]    Therefore, it must speak through its record.   [Morrow v. Pike County, 189 Mo. l. c. 620.]   The inherent power of a court of record to supply entries *nunc pro tunc* which have been omitted through the misprision of its clerk, where sufficient data exist in the clerk's office, ought not to be gainsaid. This power does not depend on statute, but is a necessary incident to the jurisdiction of every court of record— inasmuch as, by a presumption of law, the record imports verity, therefore, it is essential to the administration of justice that records should speak the very truth they are held to import.    [Jillett v. Bank, 56 Mo. l. c. 306; Turner v. Christy, 50 Mo. 145; Loring v. Groomer, 110 Mo. l. c. 639; State *ex rel.* v. Bird, 108 Mo. App. l. c. 168.]

The confusion and distress that would arise from the denial of this sensible power to a county court, whereby the business affairs of the county would be left at the mercy of the caprice, wiles, slips, lapses or other inadvertences of a clerk, are apparent.    In this

case there was a memorandum of the filing of the bond on May 7th, 1903, and on the back of the bond was a memorandum under date of June 1st, 1903, of its approval, certified to by the presiding judge. The presiding judge, while the court was in session, had power to keep minutes *ex officio*—an act of the clerk in that behalf not being indispensable. [State *ex rel.* v. Sheppard, 192 Mo. l. c. 514.] His narration on the back of this bond may, therefore, be laid hold of as a minute of the court's action, in the absence of better evidence. Moreover, it will be seen that the prior order of May 4th, in substance, designated Salmon & Salmon as depositary on the condition subsequent that they file a bond and that the same be approved. This designation was premature and untimely; but it is evidence of the intendment of the court, although at that time the court had no present duty except to select out the successful bidder, and although in contemplation of the statute the formal designation of the depositary is to follow as a sequence to the selection of the bidder and the bidder's filing his bond and its approval by the court. The memorandum of the presiding judge was made during the session of the county court; and taking that memorandum in connection with the former entries of record, that is, viewing the matter altogether, in my opinion, the data were sufficient to support a *nunc pro tunc* entry approving the bond and making the designation.

In the second place, the statute does not say that the bond must be approved in five days. What it does say is that it must be executed within five days—that is, signed and delivered. If it were held that the evidence of its validity ought not to rest alone in mere memory, yet in this instance the evidence of its delivery is shown by the file-marks attested by the clerk.

In the next place, a rigid compliance with all the *minutiae* of the statute is not indispensable to the validity of a depositary bond. To stick in the letter is to stick in the bark. To stick in the dry letter is but to

pay tithes of mint and anise and cummin, omitting the weightier matters of the law. When faith and credit have been given to a depositary bond and such bond has performed the function of obtaining for its principals money, property or other valuable thing, it illy becomes its obligors to invoke immaterial variances from statutory form in avoidance of liability. Bonds of like character have been held binding, though not in precise statutory form. [State *ex rel.* v. O'Gorman, 75 Mo. 370; Newton v. Cox, 76 Mo. 352; Wimpey v. Evans, 84 Mo. 144.]

And, finally (if the foregoing were not conclusive), it must not be lost sight of that the bond in suit narrates that Salmon & Salmon were selected as county depositary. The proof is that on the making of the bond and its filing and approval Salmon & Salmon became the county depositary. They assumed and acted that role, received all the county moneys as such depositary, and thereby to all intents and purposes became county depositary *de facto*. By signing and delivering the bond in suit the sureties intended Salmon & Salmon should be county depositary. That act enabled them to get hold of the county moneys. Under such conditions it becomes immaterial whether there was any formal order designating Salmon & Salmon county depositary. Such order was not intended for the benefit of the sureties, it was no concern of theirs. Its office was to give authority to the depositary to demand the county funds from the treasurer, and its force is spent in that direction. [Section 6821, *supra.*] The engagement of these sureties was to stand sponsor for Salmon & Salmon— to answer for their default. Now, that default could arise as well on an irregular, as regular, designation of them as depositary—whether they were a depositary *de facto,* or *de jure.* Moreover, the bond was for the benefit of the public (not of the sureties); and the welfare of the public is the touchstone we must seek; for does not the maxim, *salus populi suprema lex esto,*

shine on the very face of the great seal of the State itself, as a perpetual admonition to us of that controlling rule of law?

That, under proof such as in this case, the bond is valid without such preliminary order, has been held in effect in Board of County Commissioners of St. Louis County v. American Loan & Trust Co., 67 Minn. 112; Board of County Commissioners of Renville County v. Gray, 61 Minn. 242; Board of Commissioners of Hennepin County v. State Bank, 64 Minn. 180; Board of Commissioners of St. Louis County v. American Loan & Trust Co., 75 Minn. 489.

In County Commissioners v. State Bank, *supra,* the board of county commissioners had designated the depositary in the teeth of a statute requiring the board of auditors to make the designation. In a suit on the bond the sureties defended on the theory the designation was void. What was said in disposing of that contention, is applicable in this case, viz.: "In principle, this case falls within the rule that the sureties upon an official bond, by virtue of which the officer has been inducted into office, cannot, when called upon to answer for his official defaults, escape liability upon the ground that their principal was not duly elected or appointed, or did not legally qualify. [Mechem, Pub. Offi., sec. 341; 2 Brandt, Sur., sec. 521; State v. Bates, 36 Vt. 387; People v. Evans, 29 Cal. 429; Byrne v. State, 50 Miss. 688; Taylor v. State, 51 Miss. 79.]"

The contentions in hand cannot be allowed as sound, in view of the foregoing, and, accordingly, are ruled against defendants.

II. The foregoing disposition of subsidiary questions brings us to the main position of defendants' learned counsel. Based on the allegation of the answer that "whatever loss, if any, of plaintiff's funds accrued and whatever damage, if any, accrued to plaintiff under some depositary bond given prior to the signing of the instrument sued on and given by other parties

than these defendants," it is argued that the facts in proof sustain that averment of the answer and constitute a defense.

The defaults alleged in the petition touching the failure of Salmon & Salmon on June 20, 1905, and the non-payment of checks drawn by the county treasurer on presentation, stand admitted. The allegation of the petition touching a breach of the bond in the particulars of Salmon & Salmon failing to faithfully keep all the funds of the said county, including the funds belonging to the school districts in said county, and failure to faithfully account for the same, as by the law and the terms of the bond they were required to do, is denied; and whether that allegation was proved depends on the probative force to be judicially allowed to the proofs.

Attending to the facts, it was admitted at the hearing that Salmon & Salmon were insolvent on May 4th, 1899; that their affairs grew no better from that day until their bank closed; that the State Bank of Clinton, Missouri, was doing business as a banking corporation in the same town on May 4th, 1899, and that for one term prior to said date, said State Bank had been county depositary of Henry county; and that said State Bank was insolvent. It appears that the relations between these two afflicted banks were sympathetic and close. The fact of their mutual insolvency was unknown to the public, and (as it turned out) Salmon & Salmon conducted their own affairs on the theory that the fall of the State Bank might drag down Salmon & Salmon in a common ruin. We do not find any evidence to sustain the theory that the officers of the State Bank or of Henry county knew or suspected that Salmon & Salmon were insolvent at any time before they plunged over the brink of open and palpable disaster, or that the officials of Henry county knew that the State Bank was insolvent at the time it was (or ceased to be) county depositary. The long-continued insolvency of the

Salmon bank, and the insolvency of the State Bank during its term as depositary, are facts lodged in the case by admissions for what they are worth. But the evidence tends to show that Salmon & Salmon possessed the secret of the State Bank's financial distress, and we may well presume (for present purposes) they knew their own.

As said, the State Bank had been depositary from May, 1897, and its term was to expire in May, 1899. At that immediate time it held $69,155.77 of county money, of which sum it had $10,341.16 on deposit with Salmon & Salmon. In this condition of things the term of the State Bank as depositary ended, Salmon & Salmon bid off the county money, was designated as county depositary, and took over the county funds for a term to end in May, 1901. One of the Salmons being on the depositary bond of the State Bank, the *modus transferrendi* adopted at the suggestion of the two banks was as follows: The county treasurer in due course of business drew his check on the State Bank for the whole sum on deposit, to-wit, $69,155.77. This check was delivered to Salmon & Salmon, and the new depositary gave the treasurer credit for that sum; but it did not exact of the State Bank payment in actual cash. By a private arrangement with that bank they presented the treasurer's check there, they charged the State Bank on their own books with the face of the check, crediting the account thus opened with the $10,341.16 Salmon & Salmon held on deposit, they gave the treasurer a passbook showing a credit to him with Salmon & Salmon of the full amount of the county funds; and the books of the State Bank were made to show that the bank owed Salmon & Salmon the amount left in its vaults—the treasurer, we take it, knowing nothing of these by-arrangements and acting throughout in good faith in transferring the county's funds to the new depositary in the usual and ordinary course of banking business. As the result of this method of bookkeeping, it appear-

ed on Salmon & Salmon's books that they had received all the county money, but of their own choice had deposited back $58,814.61 in the State Bank. The books of the State Bank, *mutatis mutandis*, were made to show like entries and remained in that condition until it went into liquidation, on June 28, 1899, through Salmon & Salmon.

Attending to this liquidation, the plan was not based on the theory the State Bank was insolvent; but on the theory set forth in their agreement that it was "no longer profitable to continue the business of said bank, and that it is to the interests of all concerned for said bank to go into voluntary liquidation." The liquidation agreement is contained in several contemporaneous instruments. The gist of it all was that the State Bank sold and transferred its assets (lock, stock and barrel) to Salmon & Salmon and gave a bond to indemnify Salmon & Salmon against excess of liabilities over assets. The Salmons in turn executed a bond to the Secretary of State to pay all depositors in due course of business. They also bound themselves to the State Bank in consideration of said transfer to pay all deposits due from the State Bank to both time and call depositors and to pay all debts of said bank, "as they shall be presented . . . in the ordinary course of business." When the creditors were paid in full, the *residuum* of the assets of the State Bank were to be divided by Salmon & Salmon between its stockholders, *pari passu*, but this feature of the liquidation is of value only as a reminiscence.

Mr. Casey was the cashier and manager of Salmon & Salmon. When upon the stand he was asked to give the face value of the assets turned over by the State Bank to Salmon & Salmon. This he could not do, and we find nowhere any light upon that subject. Nor do we find any appraisement or estimate made of these assets based on the condition of things at the time of the transfer. We find, however, that Salmon & Salmon col-

lected $60,000 of those assets and we infer that the
debts of the State bank (barring the county deposit)
aggregated that sum.    There was evidence that some
of the assigned notes could not be collected; and we in-
fer from Mr. Casey's testimony that the transferred
assets fell short in about the amount of the county
money the State Bank had at the time it ceased to be
depositary.    All the debts of the State Bank, except
the indebtedness shown by its books to Salmon & Sal-
mon, were paid by them dollar for dollar within a very
short time on presentation at their counter.    So, too,
so far as the public eye could see, the credit upon the
books of Salmon & Salmon of the amount due by the
old depositary was a *bona fide* bank transfer; and from
that day on, until Salmon & Salmon ceased to be a go-
ing concern, all checks drawn by the county treasurer
on the county funds were regularly honored on presen-
tation.

It should be said in this connection that when the
first term of Salmon & Salmon as county depositary ex-
pired in May, 1901, they again became depositary for
the ensuing term of two years, giving bond and retain-
ing possession of the county funds.    At the expiration
of that term in May, 1903, they succeeded themselves
as county depositary and gave the bond in suit—the
account kept by Salmon & Salmon with the respective
treasurers of Henry county for nearly six years being
an open, continuous running account of debits and cred-
its and never changing except to note a change in name
when one incumbent stepped out and another stepped
in.

There was evidence that in 1906 the indemnity
bond taken by Salmon & Salmon from the State Bank
was worthless; but whether it was worthless when tak-
en, or the obligors became insolvent through stress of
subsequent events, so that they were independently
poor at the date of trial or the date of the Salmon fail-
ure, we cannot make out.

It appears that Stephen M. Coale was treasurer of Henry county from January, 1901, to January, 1905; and that when he came to settle with his successor, Clay Adair, in January, 1905, he was short in his accounts $2,800. This money he had not deposited with the county depositary. To make up this shortage, of which Mr. Adair knew nothing, Coale discounted a note with Salmon & Salmon and the proceeds of this note were ostensibly placed as a credit on the treasurer's account, thereby making it whole. Thereupon the round sum shown on the books of the bank (and shown by the treasurer's books) was set over to the credit of Mr. Adair as county treasurer. The note transaction was not in the usual course of banking business—that is, Coale did not present the note for discount in his own favor as an individual. It was not discounted and the proceeds placed to Coale's individual credit. Coale did not pay Mr. Adair for any shortage by drawing a check on his individual account, so that Mr. Adair might present that check for payment in due course and deposit it or its proceeds to his credit as treasurer. The plan adopted was simply this: Casey knew of Coale's shortage and, as cashier of Salmon & Salmon (they being on Coale's bond) came to his rescue. Coale put the note in the bank, it was accepted and the bank swelled Coale's accounts as treasurer with the imaginary proceeds of the note. Coale then drew a blank check in favor of Mr. Adair, which the bank filled in for an amount necessary to transfer Coale's deposit as treasurer over to Mr. Adair. The evidence shows that this note was worthless at the time it was taken, and known to be so, and that the *corpus* of Salmon & Salmon's estate was not increased by a penny, except that subsequently there was $200 paid on the note to the bank, or else the father of Mr. Coale paid $200 on the deficiency simultaneously with the delivery of the note—the testimony leaving that fact in doubt.

It appears that in some of the years after May 1st,

1899, there was more money paid out on treasurer's checks than that officer paid into the depositary. In other years the boot was on the other foot. The daily balances of the county deposit were not in evidence, and, therefore, we cannot tell what either the low water-mark or the high water-mark of that balance was. The balance at few periods during the running of the account is shown. For instance (as said) on May 4th, 1899, the county had a credit of $69,155.77; on June 1st, 1903, it had a credit of $66,625.28; on the 6th of December following, its credit was $55,114.41; and when Mr. Adair took charge in January, 1905, Mr. Casey, for Salmon & Salmon, handed him a pass-book in which the county's credit was put at $45,120.30. The items of the account subsequently we deem unimportant, since it was agreed at the trial that Salmon & Salmon's books, as well as the treasurer's books, showed a credit in favor of the county at the time of the failure of a sum the same in amount substantially as the damages found, *nisi*, to-wit, $63,000.00. By a by-arrangement (a pooling contrivance) between Salmon & Salmon and the Citizens Bank of Clinton, originating at the inception of Salmon & Salmon's last term, as county depositary, the Citizens Bank was to share in the deposit of county funds. Accordingly, Salmon & Salmon deposited with the Citizens Bank $16,000 of county money; and that sum remained to the credit of Salmon & Salmon in the Citizens Bank when the end came. What has become of that deposit is not disclosed, further than that it is in litigation between the general creditors of Salmon & Salmon on one hand and the county of Henry on the other.

Estimates are in evidence tending to show, say, a million dollars of debts against the Salmons' estate to be met by, say, a hundred thousand dollars of assets, and making in sight (in the distance, barring costs and kindred ills) a possible dividend of ten per cent.

On this record it is contended by defendants that

the deficit did not accrue under the bond in suit, but accrued either on the bond of the State Bank or on some bond given by Salmon & Salmon for the first two terms as county depositary—hence there is no liability.

It is further insisted that, at all events, the Coale shortage ought not to be shifted from the shoulders of Coale's bondsmen as county treasurer, and put upon the overloaded shoulders of the sureties on the depositary bond.

Of these, *seriatim*.

(a) In expounding legislation, it is permissible to consider the mischiefs to be retarded and the benefits to be advanced by that legislation. To this end we may assume a knowledge of the events of current public history; for courts ought not to proceed on the theory they do not know what everyone else does know. Prior to the enactment of the county depositary law, county treasurers sought the safety afforded by banks in keeping public moneys and deposited them therein. The value of such deposits to a bank was apparent and (in some instances) became a matter of secret and stealthy dicker between county treasurers and bank officials— the increment of gain accruing to the bank becoming a matter of "addition, division and silence" between them. Recognizing it was unsafe, and, therefore, unwise to lock up public moneys in the safes of county treasurers and that (in the long run) it was better to deposit such moneys in banks, the Legislature made it impossible for county treasurers to be *toled* into slyly adding to their official salaries, and, by the same stroke, restored to the public a share of the gains accruing from the use of public funds by banks. The plan adopted was to *sell the use* of these funds to the highest bidder and to restrict bidding to incorporated banks, or individual bankers. On one hand, it was made the duty of county treasurers to deposit all county moneys in the selected depositary; while, on the other, it was

made the duty of the depositary to pay the agreed interest to the county for the benefit of its roads and bridges.

It is obvious that this plan did not contemplate that public funds should be kept intact as a special deposit by the depositary. It possibly is only in dreams that a bank pays for the privileges of keeping a special deposit—the bailor pays, not the bailee, under such circumstances. Therefore, the statutory plan does not involve the notion of a special deposit, but it necessarily involves the notion that the depositary was to use the funds, and pay for that use. It follows that such funds were not to be kept as the servant of old kept his pound, *i. e.*, laid up in a napkin. They were to be sown abroad in loans and set loose in investments in the usual current of commercial transactions and in the ordinary course of good banking; and the county was to reap a share of the harvest of that sowing. But in order that the public should be protected a depositary bond was required, guaranteeing, in substance and effect, that the depositary bank should pursue such a safe method of banking as would result in paying the treasurer's checks on presentation and demand according to the course of banks and in (that sense and not literally) faithfully keeping the funds of the county against the day they should be called for according to law.

In order, then, to get at the scope of this bond the statutes pertaining to the subject-matter of county depositaries must be read into the bond, and the obligors must be held to contract with a view to those statutes. [State *ex rel.* v. Rubber Mfg. Co., 149 Mo. l. c. 212.] This does not strike down the hornbook propositions that the obligation of the surety should not be stretched or swollen by mere implication, and that sureties are favorites of the law and are entitled (subject to some qualifications) to stand on the terms of the bond, construed *strictissimi juris*. It merely puts the matter on

a common-sense footing as between man and man by reading the written law into the bond, discerning the objects to be subserved by the bond, and getting at the true intent and meaning of the bond by applying its terms to the objects sought. The general language of the bond must be interpreted in the light of these considerations.

It follows that the relation between the depositary and the county is that of debtor and creditor; that the depositary does not occupy the relation of a public officer having charge of public funds, which he may not use; and that the bond in suit is not, in a strict sense, an official bond. To the contrary, when the money of Henry county passed into the vaults of Salmon & Salmon as county depositary it became, in legal effect, their money, subject to their use in banking. They became indebted to Henry county, and their sureties became sponsors for the payment of that debt on demand, in the time and manner contemplated by the statute.

In the foregoing view of the bond, we should not take the law of this case from doctrines announced in and applicable to suits on official bonds, as such, and search in a great haystack of insolvency for the needles of this, that or the other loss suffered by the Salmon bank. It would serve no purpose in the law to challenge or encounter the anxious danger of becoming puzzle-headed with bewilderment in a labyrinth of insolvency—a labyrinth more intricate than that of Fair Rosamond at Woodstock; for, if losses occurred (and they did) they, in the eye of the law, were losses of the funds of Salmon & Salmon—not of Henry county—and the sureties ought to be held to have contracted with an eye to that very result. The debt due that county remained a debt during all these vicissitudes; and when Salmon & Salmon refused to pay that debt on demand, an actionable breach occurred on the bond in suit.

The rule invoked by defendants' counsel is found laid down in the leading case of United States v. Eck-

ford's Exrs., 1 How. 263; and the same rule in effect is announced by this court in State *ex rel.* v. Finn, 98 Mo. 532; State *ex rel.* v. Branch, 151 Mo. l. c. 637; State to use v. Smith, 26 Mo. 226; State *ex rel.* v. Elliott, 157 Mo. 609; and in other cases. That rule requires the time of the several deficits and several amounts to be ascertained, so that rights of successive sureties may be protected. It proceeds on the theory that the official whose bond is being breached had not kept, but had applied the money of the obligee to his own use; and as a general proposition it does not allow moneys of the obligee coming into the hands of the obligor during the term of a second bond to be applied to a deficiency occurring under a former bond. But the reason of the rule fails and the rule itself must fail in the case at bar; because here there was no loss or misapplication by Salmon & Salmon of county funds, *as* county funds. The funds they misapplied or lost in their banking ventures, as pointed out, were their own.

In Board of County Commissioners of Redwood County v. Citizens' Bank of Redwood Falls, 67 Minn. 236, a depositary bond was in suit. In that case it was contended, as learned counsel do here, that the court must seek out and locate the precise time and amount of a loss. If that loss occurred during the term of a former bond, then, it was argued there (as here) that the bondsmen for that term should be held liable and the bond in suit be discharged *pro tanto.* MITCHELL, J., well disposed of that contention, as follows:

"The further and last contention of the defendants' counsel is that the general rule as to the appropriation of payments has no application to the case as against them; that the county cannot insist on any of the payments made by the bank during the term of the bond being applied towards satisfying this balance due for money deposited during the previous term, but, on the contrary, that they are entitled to have all such payments treated as having been made on account of

funds deposited during the current term, and, hence, as such payments exceed the amount deposited, the condition of the bond has been satisfied. Here, in our opinion, is the fallacy in counsel's argument:

"The cases cited by them in support of their position were on official bonds, where the principal was a mere custodian of public funds, which he was bound to keep intact, and to pay over to the government or municipality whose officer he was, which continued during all the time to be the owner of the money. He could not use it for any other purpose without a violation of duty. Hence he had no more right to use public moneys which came into his official custody during one term to discharge his liability on account of an embezzlement committed by him during the previous term, than he had to use it to pay any other debt which he owed. To pay such a defalcation out of accruing receipts during a subsequent term would be a fraud upon the sureties for such term. The money in the hands of such an official is not his money, but the money of the public. U. S. v. Eckford's Exrs., 1 How. 250, which grew out of the noted Swartwout defalcations, is a leading case on the subject, and states the rule and the reasons for it as well as they are stated anywhere.

"But the relations of a bank to the county and to the funds deposited with it under this statute are entirely different. The relation between the bank and the county is that of debtor and creditor, the same as between it and any other depositor. The money deposited does not remain the property of the county, but becomes the property of the bank, which it has a right to lend or use in any other way it sees fit. This right is implied from the fact, if from nothing else, that the bank is to pay interest on the money. When the bank pays out money on the check or draft of the county, it is using its own money, and not that of the county; in other words, it is merely paying its debt with its own funds. It is never in default until payment is demand-

ed by the county and refused. If a bank is designated as a depositary for two or more successive terms, while the time is, as respects liability of the sureties on the different bonds, deemed divided into different terms, yet, as between the bank and the county, there is the uninterrupted relation of debtor and creditor during the whole time on one continuous account. When payments are made on that account, the sureties have no right, either in law or equity, to control the appropriation of them, or to require that they shall be applied on deposits made under their bond.

"In their last analysis, the facts, according to their legal effect, are that, upon a mutual current account, the bank has, during the term of this bond, made payments, with its own money, on its indebtedness to the county, amounting in the aggregate to more than the amount of the new indebtedness which it has contracted on the same account during the same time. The money with which such payments are made is the money of the bank, which it may apply as it chooses; and, this being so, then, by a parity of reasoning, if it is paid generally without any express stipulation or arrangement between it and the county, the law will apply it on the account according to the priority of time; that is, the first item on the debit side of the account is discharged or reduced by the first item on the credit side. [Hersey v. Bennett, 28 Minn. 86; Jefferson v. Church of St. Matthew, 41 Minn. 392.] There is nothing in the facts to take the case out of this general rule as to the application of payments."

The general rule for the application of payments is to apply them as the debtor directs. In the absence of his direction, the creditor may direct the application. In the absence of an application by either, the law places them in accordance with right and justice; and the rule invoked by the Minnesota court, *supra,* for the application of payments in a running current account

is not strange in Missouri. [Goetz v. Piel, 26 Mo. App. 634; McCune v. Belt, 45 Mo. 174.]

As pointed out by plaintiff's learned counsel, that rule has sometimes been applied where sureties are concerned—the doctrine being that the surety assumes the obligation of the principal, and that the rule which determines the liability of the principal also determines the liability of the surety. [Goetz v. Piel, *supra;* Turner v. Yates, 57 U. S. 14; Allen v. Culver, 3 Denio 284; Pope v. Ice Co., 91 Va. 79.]

The Supreme Court of Minnesota followed Board of Commissioners v. Citizens Bank, *supra,* in a later case on a depositary bond: Board of County Commissioners of St. Louis County v. American Loan & Trust Co., 75 Minn. 489. The same result was reached by the Supreme Court of Kansas by approaching the matter from a different viewpoint: Brown v. Board of Commissioners of Wyandotte County, 58 Kan. 672; Myers v. Board of County Commissioners of Kiowa County, 60 Kan. 189; both these cases involving depositary bonds.

As the question is new in this State and keenly touches the common weal, we are free to adopt the view best calculated to further the beneficent purposes of the statute in the conservation of public funds, and we consider the pronouncements of the Supreme Courts of Minnesota and Kansas in suits on depositary bonds to subserve that purpose. It matters not, then, whether the bond in suit be deemed both prospective and retrospective, or merely prospective, the end reached is the same—that is, there was a continuous debt during the life of all the bonds given by Salmon & Salmon. The account between the county and Salmon & Salmon was an open current account, on which payments were being made. The payments came into the trial unapplied, and in accordance with the Minnesota and Kansas rule of application, the deficiency is brought down to within

the life of the bond in suit; and this holding fastens liability upon defendants as sureties on that bond.

And this is so notwithstanding the fervent contention of defendants' counsel that no actual money was turned over by any outgoing treasurer to his successor, but that transfers were made by check alone. It is argued that such transfers under the facts in judgment are colorable merely—as symbolical and idle, so to speak, as the act of that droll personage who

> Seem'd washing his hands with invisible soap
> In imperceptible water.

As we grasp it, it is further argued (in effect) that the duty of an outgoing county treasurer is to deliver the county funds to the incoming treasurer in kind or in substantial equivalent; and that it is the duty of the incoming treasurer to either count the county's moneys or take such course as substantially means that and deliver them in kind to the county depositary—that there must be a *res* deposited before the bondsmen of the depositary can be bound. But does it lie in the mouths of these sureties to make such contention? They knew that the county's business was being transacted through banks and in the usual course of dealing by checking on banks. They contracted with their eyes open to that fact; and they must not now complain that the transfers were made in a way common to the banking business.

But, furthermore, the *res* in this case (in last analysis) was the assumption by Salmon & Salmon of liability for a debt—was the establishment of the relation of debtor to a creditor; and that liability was a continuous and transmitted liability from end to end of the transaction. The bond recognized the liability and duty to pay and stood good for the performance of that duty. In this condition of things, if the sureties of Salmon & Salmon were solicitous over the solvency of the Salmon bank, or out of caution wished to satisfy them-

selves of the depositary's ability to pay the county debt, then the same avenues leading to information were open to those sureties that were open to the county treasurer. No reason is perceived why they should not have sought out the facts before they put their names to the bond; for sureties are bound to be diligent in their own protection. They should no more than other people take a leap in the dark, but look before they leap.

If we were to admit (which we by no means do) that the county should be bound by negligent omissions of its treasurer, yet we should be bound to hold that the negligent omissions should be the proximate cause of the injury to the sureties in order that a release might be predicated of them. Now, this is not a case of the blind leading the blind and both falling into the ditch. Here there was no leading whatever. Here the sureties acted on their own initiative—that is (to speak figuratively and in no sense personally), the blind fell into the ditch, unled and unenticed.

In a general way, too, it may be said that the long-continued insolvency of Salmon & Salmon does not, at first blush and standing alone, affect the merits of this case one way or the other. And this is so because, while a county court should not knowingly select an insolvent bank as a county depositary, yet the statute does not forbid such selection. To the contrary, the solicitude of the statute spends its force on the depositary bond as a shield of protection. The high financial qualifications of the sureties on that bond are set forth in the statute; and we are unable to see why sureties may not stand sponsors for an insolvent bank as well as a solvent one, provided they choose to take that course.

To my mind these sureties ought not to say they were lulled into sleep or into loss by the action or non-action of the county treasurers in the method adopted of transferring the county funds by check. To the contrary, the public may well say that it was lulled into se-

curity by the act of defendants in giving the bond in suit, on the faith and credit of which Salmon & Salmon remained undisturbed as Henry county's debtor, with their debt waxing more and more day by day.

But, it is argued, the county funds were lost in the State Bank; that that bank was broken and empty; that the deficiency of 1905 was the deficiency of May 1, 1899—no more, no less; that, in effect, this deficiency was transferred by mere book-keeping to the books of Salmon & Salmon, resulting in no deposit of any funds whatever. This contention, too, must be disallowed. Because:

(1)    At the time the State Bank ceased to be depositary it was a going concern. So far as appears here it had credit and was honoring its checks. So was Salmon & Salmon a going concern, having credit as a bank and then holding, by grace of the State Bank, over $10,000 of the county's deposit. We need not inquire or decide what might have been the effect on the bondsmen of Salmon & Salmon if the State Bank had broken leaving its creditors in the lurch; nor need we inquire or decide what might have been the effect on such bondsmen if Salmon & Salmon had not taken over all the assets of the State Bank. The case presented to us is the usual case of a new depositary leaving temporarily with the old depositary some of the funds belonging to the county. It is, furthermore, the ordinary case of one bank taking over the assets of a crippled bank and (arming itself with a bond against a deficiency) agreeing to pay all the deposits and debts of the crippled bank. This is an honorable death for a bank to die. By the transfer of its assets, the good will of its line of depositors went to Salmon & Salmon. Doubtless, too, the transferring of these assets, with the indemnity bond, was considered a proper business stroke —especially so when Salmon & Salmon were sureties on the State Bank's bond as county depositary. That transaction must be looked at in the light of the then

existing condition of things; and we cannot say, on this record, it was not a wise and proper step, nor can we say that all these transactions, taken together, did not result in a deposit with Salmon & Salmon.

(2)  But it is contended that Salmon & Salmon only acquired assets enough to meet all the current liabilities of the State Bank and did meet and liquidate those liabilities—save and except the county debt, *i. e.*, everyone was paid in full but the county; and it received not one cent.  We do not understand that the legal effect follows contended for, and hence can not allow force to this suggestion.  Such result is not reached by an analysis of the daily transactions of Salmon & Salmon.  Such result is reached as a conclusion from views taken six years after such transactions — " 'Tis. distance lends enchantment to the view." · The truth is that Salmon & Salmon (under a bounden duty to pay all) paid out of their own funds  only the demands presented at their counter by creditors of the State Bank. The truth is that as Salmon & Salmon was a creditor of the State Bank to the extent of the county deposit left in that bank, they alone could present that claim for payment, and did not go through the idle ceremony of presenting their own claim, as creditor, at their own counter, as debtor, for payment to themselves.  The far-reaching and sinister result contended for by counsel did not flow from this considerate and voluntary omission.

But learned counsel are in error in concluding from this record that the deficiency is identically the same.  To my mind it could not possibly be the same.  For instance, while the county money was deposited in bulk in the State Bank, yet, in reality, that money belonged to divers and sundry funds—school money belonging to this or the other district, road money belonging to this or the other district, county revenue, and, doubtless, interest funds and other funds.  Now, when Salmon & Salmon failed, it is not shown or pre-

tended that the deficiency represented school moneys due the same districts or road moneys due the same road districts, etc., and the present deficiency would presumably have to be distributed among various funds in an entirely different way.

But it is useless to pursue the discussion because it cannot be said that Salmon & Salmon got no deposit to start with. They got precisely what the county had—the right to look to the State Bank for the payment of a debt, they adjusted that liability to suit themselves, and they got the means the State Bank had to pay; and however we may view the matter of bookkeeping, the bondsmen cannot complain of a banking transaction which was at the time within the purview of fair banking custom.

(b) But so much cannot be said of the transaction closing the Coale shortage. That transaction was not in the usual course of banking business and bears all the earmarks of a legal fraud—of a confessed attempt to unload a burden off of the shoulders of the treasurer's bondsmen, where it belonged, onto the shoulders of the depositary bondsmen, where it did not belong. This Casey and Coale could not do in that way. The *corpus* of the Salmon estate was not increased by this manipulation of a present worthless note covering a known conversion of county funds by the treasurer himself. So that, the Coale transaction, on principle, stands on a different footing than the transactions we have been considering. In my opinion, defendants should be held for the $200 that by that act passed into the chest of Salmon & Salmon, and no more. The damages assessed below at $63,000 were too much by the sum of $2,600.

Under our statutory power (R. S. 1899, sec. 866, see Laws 1903, p. 105) we will enter here the judgment the trial court should have given. Therefore, the judgment is reversed as to the Coale item of $2,600, leaving the damages to be paid in satisfaction of the penal sum

of the bond $60,400.00, instead of $63,000.00, as assessed below. The judgment for the penal sum of the bond and sustaining the attachment is affirmed and the judgment for the damages, as modified above, is affirmed in the sum of $60,400, to bear interest from the date of the original judgment, and execution is ordered to issue—appellants to pay costs below, but respondent to pay the costs of appeal.

Gantt, C. J., Burgess, Valliant, Fox and Woodson, JJ., concur; Graves, J., not sitting (having been of counsel below).