JOHN GARROW, THOMAS Y. HOW, JR., JAMES SEYMOUR, AND GEORGE MILLER, APPELLANTS, *v.* AMOS DAVIS, GEORGE M. PICKERING, WILLIAM MCCRILLIS, AND EPHRAIM PAULK.

Black, as agent for the owners, contracted to sell a large quantity of land in Maine, which contract was assigned by the vendee, until it came, through mesne assignments, into the hands of Miller and others.

Payments were made from time to time on account; but at length, in consequence of a failure to make the payments stipulated in the contract, and by virtue of a clause contained in it, the contract became void.

In this state of things, Miller employed one Paulk to ascertain from Black the lowest price that he would take for the land, and then to sell to others for the highest price that he could get.

Paulk sold and assigned the contract to Davis for $1,050.

Upon the theory that Paulk and Davis entered into a fraudulent combination, still, Miller and others are not entitled to demand that a court of equity should consider Davis as a trustee of the lands for their use. They had no interest in them, legal or equitable, nor any thing but a good will, which alone was the subject-matter of the fraud, if there was any.

But the evidence shows that this good will did not exist; for Black was not willing to sell to Miller and others for a less price than to any other person.

Although Paulk represented himself to be acting for Miller and others, when in reality he was representing Davis, yet he did not obtain the land at a reduced price thereby; but, on the contrary, at its fair market value.

The charges of fraud in the bill are denied in the answers, and the evidence is not sufficient to sustain the allegations.

THIS was an appeal from the Circuit Court of the United States for the District of Maine, sitting as a court of equity.

The appellants were complainants below, whose bill was dismissed under the circumstances stated in the opinion of the court.

The cause was argued by *Mr. Seward*, for the appellants, and by *Mr. Shepley* and *Mr. Rowe*, for the appellees.

Garrow et al. *v.* Davis et al.

## Complainants' Points.

Point I. The complainants, assignees of the contracts of February 17, 1835, for 28,804 acres of pine lands, had an interest in those contracts and lands, which subsisted until they were surrendered by Davis to Black, in November, 1844; and this interest was, if not a legal chose in action, at least a chose in equity of some, and even considerable value. These instruments were executory contracts for the purchase of land, of a value, variously estimated at different times, of from $86,000 to $172,000.

Point II. The complainants are proper parties, and are entitled to maintain their suit against the defendants.

Point III. The defendant Paulk, while acting as agent of the complainants, in procuring possession of the contracts and the power to assign them, and in conducting the negotiations in their behalf with Colonel Black, on the one side, and with the defendants and others, as purchasers, on the other side, committed the frauds charged in the complainants' bill. The allegations of the bill on this important issue are sustained.

Point IV. The defendants, Davis, Pickering, and McCrillis, by means of frauds committed by Paulk with their knowledge, had, by colluding with him in the perpetration of these frauds against the complainants, acquired from Colonel Black, at the cost of the complainants, and under false representations to him that they were the assignees of the complainants, and that the complainants were the real beneficiaries, the contracts for the 28,804 acres of pine land in Maine, which was of very considerable value.

Point V. The defendants' excuses and attempts to explain are unavailing.

Point VI. The complainants are entitled to a decree, according to the prayer of their bill. The account to be decreed is an account of future as well as past profits; and the defendants ought to be decreed to assign the contract of Black to the complainants upon just terms, so as to secure the defendants their advances, and to the complainants their profits.

## Defendants' Points.

1. None of the parties plaintiff had any interest in or under the Black contract at the time of the alleged fraud.

2. The claim, if any, is stale, and is lost by laches of the plaintiffs.

They have never refunded to Davis the money he paid; nor offered to do so.

They never offered to repay the cash payment of $7,500; or to take up, or to indemnify Davis and Paulk against the notes given for the land; but waited till September, 1847, till the result of the operations on the township showed the speculation to be a good one; and then they filed their bill claiming the benefit of it.

No court can allow one party to hold himself prepared to take advantage of all favorable contingencies, without being affected by those which are unfavorable. Marshall, C. J., in Brashier *v.* Gratz, 6 Wheat. 528; 13 Ves. 238; 4 Dall. 345; 14 Pet. 170; Benedict *v.* Lynch, 1 Johns. Ch. R. 370.

3. The plaintiffs had not the means nor the intention of purchasing the lands at such a price as they would fetch in the market. They were embarrassed in their finances, disgusted with speculations in Eastern lands, and "in ignorance, doubt, and uncertainty, as to the real value of said lands, and the true quantity of pine timber thereon;" their only intention being to sell the contracts. Paulk was directed to ascertain the final and lowest price that Black would take for the lands of the persons holding the contracts, for the purpose of aiding him in the sale of the contracts, and not for the purpose of enabling his principals to decide whether they would or not become purchasers of the lands.

Years after, when the price had been quite or nearly repaid, by the proceeds of the timber, plaintiffs claim to be the equitable owners, without having advanced, or offered to advance, a single dollar.

That of which the bill charges that the defendants defrauded the plaintiffs — that is, the difference between the price at which Black would sell the lands to the plaintiffs, and the price at which he would sell to others; or, "so much as the said John Black, by compromise, should agree to take less than the fair value of the lands" — did not exist.

4. There was no fraud on the part of either of the defendants.

Each denies all combination, fraud, &c., on his own part; and knowledge, or belief, of any, on the part of his co-defendants, &c.

As each stands, in relation to this question of fraud, in a position different from the others, it will be necessary to consider their position separately.

Paulk was the agent of Miller alone of plaintiffs, p. 43; and of Norton. The case shows no precedent authority, or subsequent ratification, from the others.

By his answer, it appears that the only instructions he had from Norton were to sell, for $1,000; and if he could not get

Garrow et al. *v.* Davis et al.

that, to take less, and " to close the matter in the shortest possible time."

That Miller's instructions were, to endeavor to find some one who would buy the lands, and give the holders of the bonds some portion of the lands, or of the profits (if any) of the speculation; and, " if he could not make such an arrangement, to sell the contracts for the most he could get, as the holders had neither the intention nor the means of buying themselves."

He attempted to make such an arrangement with Pickering, and failed. Any further attempt would have been useless, as Black asked him more for the land than it would fetch in the market.

He then sold the contracts for the highest sum offered.

Upon these points, the answer is responsive and uncontradicted.

There is no evidence that he could have got any more for the contracts; there is no evidence that they were worth any more.

The answer denies that he was bound by his instructions to ascertain Black's lowest price before selling; and is not contradicted.

He did, however, first ascertain all that was material on this point, namely, that Black would make no reduction in favor of his principals; nor sell the lands for less than the full market value.

The answer denies all improper disclosures to the defendants.

The answer denies that any false statement was made to Miller or Norton; and sets out the statements which were made.

There is no evidence which contradicts it, in this respect, in any material point.

The agreement, that he should continue the negotiation with Black for Davis's benefit, was not a provision for his own private benefit, but a necessary consequence of the idea of reduction in price, which he held out as inducement to Davis.

The answer denies that he had any interest in the purchase from Black, and that he received any money, property, or securities from any of the defendants, for any thing done before the assignment to Davis.

The payment of $1,500 was for honest and proper services rendered to Davis afterwards.

The answer on this point is responsive, and not contradicted, —that he acted with fidelity to his principals, to the extent even of wronging Davis, by suppressing facts which he should have disclosed to him.

(Then followed an analysis of all the answers.)

Mr. Justice CURTIS delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States, for the District of Maine, dismissing the complainants' bill. The substance of the bill is, that John Black, as agent for the trustees under the will of William Bingham, on the 17th of February, 1835, contracted, in writing, with Charles Ramsdale to sell to him a township and adjacent tracts of land in that State, containing twenty thousand eight hundred and four acres, for the price of three dollars per acre, payable one fifth in sixty days, and the residue in four equal annual payments—the contract of sale expressly providing that, in case of failure to make either of these payments, the contract was to be void. That, on the 1st day of April, 1835, Ramsdale assigned these contracts to Nathaniel Norton and Jairus Keith, in consideration of their agreement to pay to him the sum of two dollars for each acre of the said lands; and that, at a still further advance of one dollar on an acre, the contracts of Black came to the complainants and one Herman Norton, by assignment, in November, 1835.

That Ramsdale made the first, and the complainants some other payments, amounting in the whole to about forty thousand dollars, but failed to pay the residue. That subsequent to the year 1840, nothing was done by them concerning the lands until after July, 1844, when one of the complainants received from Black a letter stating that, though all their rights were terminated many years since, he desired to know whether they wished to do any thing respecting the payments for the lands. That, thereupon, Miller, one of the complainants, employed Ephraim Paulk, one of the defendants, to negotiate with Black, and finally instructed him to ascertain from Black the lowest price at which he would let the complainants have the land, and then to sell the complainants' rights and interests under the contracts for the highest price he could obtain—the supposition of the complainants being, that Black would sell the lands to them for much less than he could obtain from others, by reason of their having already paid a large sum towards the purchase-money, under the contracts above mentioned. The bill further states, that Paulk sold and assigned the contracts to Davis for the sum of $1,050; and it charges that, before doing so, he entered into a fraudulent combination with Davis and the other defendants to obtain from the complainants an assignment of these contracts for a trifling sum, and then to negotiate with Black as if for the complainants, and thus defraud the complainants of what Black should be willing to discount from the fair value of the lands, on account of their peculiar equities; that he, in combination

with the other defendants, actually executed this scheme, and obtained the lands from Black for a much less price than could have been got from others, by reason of Black's belief that he was abating the price for the benefit of the complainants. And the bill prays that the defendants may be treated as trustees of the complainants, in respect to these lands, and for an account, and for other relief.

So far as respects the title to these lands, or any claim of the complainants to have them charged with a trust in their favor, we think the complainants, upon the statements in their bill, and upon the proofs, have made no case. They had no legal or equitable title under their contracts with Black. Being in default for more than seven years, and about four years having elapsed since any thing had been done by them under these expired contracts, they were not in a condition to insist on any rights or claims to the land; and, as will be presently more fully stated, Black did not treat with them or their agent upon the basis of any legal or equitable right, nor is it alleged that they had any intention or took any measures to acquire the lands. In consequence chiefly of Black's letter, of the 22d of July, 1844, inquiring what they wished to do about the payments, they conceived that Black might be willing to sell the lands to them for less than he would sell them to others, and that this good will might be a valuable subject of sale. To dispose of it, they employed the defendant, Paulk. If they have been defrauded, in its sale, by the defendants, they are entitled to relief; but in the lands themselves they had no interest, and did not intend, by Paulk's agency, to acquire any; and if all the fraud charged in the bill was perpetrated, it affected not any title of theirs to the land, or any negotiation for its acquisition, but solely the compensation which they might otherwise have obtained for Black's good will towards them, as the holders of the expired contracts. This was the only subject-matter upon which the alleged fraud could operate.

To this subject-matter our inquiries must be limited. To entitle themselves to relief, the complainants must prove fraud and damage; or, to state the principle less abstractly, they must show that their agent disposed of what he was employed to sell, for less than its value, and that he did this fraudulently.

The value of the complainants' interest is alleged by the bill to have consisted in the intention of Black to sell the lands to the complainants for less than their fair value; and this intention is alleged to have been actually executed by Black, by a sale to the defendants at a price far less than he could have obtained from others, under the belief that this abatement of price was for the benefit of the complainants. If this were so,

it could not be doubted that the complainants' interest was a valuable one, and that its value was capable of being precisely ascertained; for it would then amount to the sum which Black thus abated from the market price of the lands.

But the proofs not only fail to show that Black intended to abate any thing from the price, but they leave no doubt that he actually sold the lands for their fair market value, without any abatement whatever. The complainants have taken his testimony, and he declares, that he did not consider the complainants had any legal or equitable claims originating from the contracts; that he never intended to make them any allowance or consideration on the renewal of the bonds or contracts, that when he sold the lands, he did not consider that he had made any deduction on account of any claims of the complainants; that if any other person had offered him more for the lands than Paulk did, he should have sold them to such other person; and if Paulk had not taken the lands at $30,000, he should have sold at that price to any one who offered it. So far, therefore, as respects the motives of Black, and his own views of the nature of the transaction, his testimony is in direct conflict with the allegations in the bill. And so far as it tends to prove that he did not sell the lands for less than he could have obtained from others, but demanded and received the fair market price for them, it is corroborated by every witness who has been examined concerning its value. Dwinal and George N. Black, two of the complainants' witnesses, say $30,000 was a fair price for the lands; and Addison Dodge, who is proved to be a person of uncommon experience and judgment concerning the timber lands of that country, and whose testimony was taken by the defendants, explored these lands in 1843 for Black, and reported to him that $30,000 was all they were worth; and he testifies that this was his opinion, formed from a careful examination. Though Black does not so state, there can be no doubt that he fixed this price in consequence of Dodge's report to him; for he employed Dodge to make the examination, and he expresses, in his deposition, entire confidence in his skill and integrity. It follows from this, as well as from what Black directly testifies to, that the price at which the lands were actually sold, was fixed as the fair market value of the lands, for which Black, as an agent to sell, was willing to sell them to any one, though he preferred to sell to the complainants, if no one should offer more.

It is true Black at first demanded of Paulk $43,206 for these lands. This was before the sale by Paulk to Davis, of the complainants' interests; and it has been argued that as the lands were actually obtained for $30,000, this proves that Davis was

benefited by the acquisition of the complainants' interest to the extent of $13,000. If Davis, when he purchased the complainants' interests had been aware that Black asked $43,000 for the lands, and had been willing to acquire the complainants' interest to endeavor thereby to get them for a less sum, this would have a tendency to prove that he was willing to give somewhere about $43,000, and that any reduction, below that sum, might be treated as the value of the complainants' interests. But it is explicitly denied by the answers of Paulk and Davis, and there is nothing in the case to control that denial, that Davis knew when he negotiated with Paulk that Black asked $43,000 for the lands.

We think the fair result of the evidence is that Paulk concealed this fact from Davis, and that Davis believed he could get the lands for one dollar per acre. So that he actually paid the fair value and something more than he expected to pay.

Upon these facts we are unable to come to the conclusion that when the complainants parted with this expectancy of good will from Black for $1,050, they received less than they could have justly obtained; or that when Davis purchased, he got any appreciable pecuniary advantage from representing the complainants.

Upon this ground, therefore, the case fails.

But inasmuch as there are charges of fraud contained in the bill we think it proper briefly to examine them.

As respects the two defendants, McCrillis and Pickering, they were not connected with the purchase from Paulk by Davis. They came into the purchase subsequently, in the manner stated in their answers, which it is unnecessary to detail, and there is no evidence which tends to show that they were guilty of any fraud.

In reference to Paulk and Davis, there are circumstances which, if unexplained, would certainly be fraught with much suspicion, to say the least.

After the sale by Paulk to Davis of the complainants' interests, Paulk continued to act in the negotiation with Black, and it is admitted that he received $1,500 from Davis. But the explanation offered is that, from the necessity of the case, Paulk must continue to negotiate with Black as if for the complainants; that they understood he was to do so; that only in this way could their expectancy of favor from Black be sold; and that no contract was made or understanding had with Davis by Paulk, save what appears on the face of the papers, that Davis was to pay him for his services subsequent to the assignment. That when Davis gave his notes to Black, the latter required a surety, and the parties being at Ellsworth,

Davis for the first time requested Paulk to sign the notes. That Paulk at first declined, saying he was insolvent, but at last consented on being assured that Davis would pay him what Pickering, a mutual friend, should say was proper, and Pickering afterwards fixed the sum at $1,500 for all his services. The answers of both Davis and Paulk, deny, with clearness and precision, every charge of fraud, and especially negative the fact that this payment of $1,500 had any connection with or influence upon the sale by Paulk to Davis of the complainants' interest. Their account of the matter may be true. There is no evidence to prove it is not so, and, grave as the causes of suspicion may be, they are not sufficient to overcome these precise and clear statements in the answers.

The letters of Paulk to the complainant Miller and his failure to give him notice of an inquiry by Black what was the most they could afford to pay, are relied on to show that Paulk kept Miller in ignorance of the material facts, and pressed him to a sale in undue and unnecessary haste and with unfair intentions.

In his note of the 24th of October, 1844, Paulk tells Miller, that "what is done with Col. Black must be done this week." It does not appear affirmatively that Black had said so, and he does not remember saying so. But after the lapse of six years he might have forgotten it, if he did say so, and he testifies that he does not recollect the particulars of the different conversations with Paulk. But however this may be, the negotiations actually went on until the 16th of November, before a sale was made by Paulk, and upon learning from Miller that he thought he could effect something by personally visiting Black, he wrote to Miller informing him he had sold the bonds for $1,050, but that he had obtained the consent of the purchasers to suspend the transfer until the 25th of November; that they were not willing to wait longer, because they desired to operate on the lands the coming winter, and in order to do so the matter must be decided on immediately; and he then strongly urges Miller to come at once to Bangor, in season to avail himself of the contract he had made, if he should find that to be most for his interest. This letter he sent to him by express to ensure its reception in season.

This can hardly be reconciled with the charges in the bill, or the deductions made by the complainants from some of the circumstances, that Paulk had unduly hastened the transfer, and intended to keep Miller in the dark and to sell to Davis for less than he might have obtained from another.

Upon consideration of the charges of fraud in the bill, and the answers denying those charges, and the proofs in the case, we are of opinion that the complainants have failed to make

out the fraudulent combination between Paulk and Davis which they have alleged, and that upon this ground also the bill must be dismissed.

The decree of the Circuit Court is affirmed, with costs.

## *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Maine, and was argued by counsel. On consideration whereof it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.