AFFILIATED ENTERPRISES, INC., a corporation of the State of Colorado, *v.* ROLAND H. WALLER, trading as New Waller Theatre.

(*March* 14, 1939.)

LAYTON, C. J., RICHARDS, RODNEY and SPEAKMAN, J. J., sitting.

*Max Terry* for plaintiff.

*Daniel J. Layton, Jr.,* and *Isaac D. Short, 2nd,* for defendant.

Court in Banc for Kent County. Case certified to that Court by the Superior Court for Kent County, being No. 36, October Term, 1937.

LAYTON, C. J., delivering the opinion of the Court:

It is accepted as a legal truth that the law will not lend its aid to a claim founded on its own violation. If, then, the plan or scheme, which is the substance of the contract declared on, is in violation of the statute, the plaintiff will unavailingly seek the protection of the Court.

There was a time when lotteries were entirely legal in this State, so much so that it was held that lottery tickets sold were properly chargeable in a book account. *Gregory & Co. v. Bailey's Adm'r,* 4 *Harr.* 256. A changed public opinion resulted in the constitutional provision and the enactment of the statute to effectuate the prohibition of the organic law.

The defendant denies liability on the ground that the contract entered into is offensive to the public policy of this State, in that it embraces a plan or scheme essentially

a lottery in its nature. The plaintiff denies that the scheme is a lottery, for the reason that there is lacking the material element of consideration as that term is, or ought to be, properly understood with respect to lotteries. This is the crucial point of the case.

 It is best, perhaps, not to define the word "lottery" too precisely, for the reason that human ingenuity is too frequently successful in evolving a scheme entirely within the mischief, but not quite within the letter of the definition. *People v. McPhee,* 139 *Mich.* 687, 103 *N. W.* 174, 69 *L. R. A.* 505, 5 *Ann. Cas.* 835. In this State the word has been judicially defined as "a scheme for the distribution of money or prizes by chance." *State v. Sedgwick,* 2 *Boyce* 453, 81 *A.* 472, 473; *State v. Gilbert,* 6 *Boyce* 374, 100 *A.* 410. This is the English definition. *Taylor v. Smelton,* 112 *B. C.* 207. It seemingly ignores consideration as an element; but, undoubtedly, that element is implied; and it is agreed that a lottery has three essentials, prize, chance and consideration. An acceptable definition is one offered by the Missouri Courts where a lottery is defined as any scheme or device whereby anything of value is, for a consideration, allotted by chance. *State v. Emerson,* 318 *Mo.* 633, 1 *S. W.* 2d 109.

The statute in this state does not attempt formally to define the term. It amounts to a broad and comprehensive denunciation of those persons concerned in interest in selling or disposing of any number, ticket or anything by which such persons promise or guarantee that any particular number shall on the happening of any contingency in the nature of a lottery, entitle the purchaser, or holder, thereof to receive money or property.

The language of the statute is important in determining the quality of the consideration as related to a lottery.

The plaintiff admits that the elements of prize and

chance are inherent in the plan; but it contends first, that the requirements of registration and attendance in the lobby of the theatre or outside at a fixed hour are but conditions for a gratitous promise, and not a consideration of the promise; and second, that peculiarly within lottery agreements, consideration, in the sense of something of value, or price, must be paid for the right to participate, a mere formal and technical consideration, while sufficient to support a contract in the ordinary sense, being insufficient to constitute value or price in the lottery sense.

It has never been denied in this State, broadly, that consideration consists in either a benefit to the promisor or a detriment to the promisee. *Szymanska v. Equitable Life Ins. Co.*, 7 *W. W. Harr.* (37 *Del.*) 272, 183 *A.* 309; and the Court is called upon here to determine first whether, generally, in a lottery sense, consideration is restricted to something of value, or price, for the privilege of participation in the scheme; and, second, whether the statute was designed to permit the use of the word in such restricted sense.

Every agreement springs from an offer and acceptance. A general offer made to the public may be accepted by anyone within the terms of the offer; and any lottery scheme or plan resolves itself into offers and acceptances. A lottery is nothing more or less than a number of offers and acceptances upon considerations.

Whether an act, or other detriment, is but a condition precedent to performance of the promise, or whether it has the quality of consideration, depends on how it was dealt with by the parties as viewed from the standpoint of a reasonable man of average intelligence and discernment. *Holmes Common Law*, 292, 293; *Street, Foundations of Legal Liability, Vol.* 2, 70.

Professor Williston in his authoritative work on con-

tracts, *Vol.* 1 (*Rev. Ed.*), *Sec.* 112, makes this clear. The writer says: "The same thing, therefore, stated as the condition of a promise may or may not be consideration, according as a reasonable man would or would not understand that the performance of the condition was requested as the price or exchange for the promise. If a benevolent man says to a tramp,—'if you go around the corner to the clothing shop there, you may purchase an overcoat on my credit', no reasonable person would understand that the short walk was requested as the consideration for the promise, but that in the event of the tramp going to the shop the promisor would make him a gift. Yet the walk to the shop is in its nature capable of being consideration, and the only reason why the walk is not consideration is because on a reasonable interpretation, it must be held that the walk was not requested as the price of the promise, but was merely a condition of a gratuitous promise. It is often difficult to determine whether words of condition in a promise indicate a request for consideration or state a mere condition in a gratuitous promise. An aid, though not a conclusive test in determining which interpretation of the promise is more reasonable is an inquiry whether the happening of the condition will be a benefit to the promisor. If so, it is a fair inference that the happening was requested as a consideration." See *Allegheny College v. National Chautauqua County Bank*, 246 *N. Y.* 369, 159 *N. E.* 173, 57 *A. L. R.* 980.

Strictly speaking, the adequacy of a consideration is not a question for judicial determination at all. That is a thing for the parties to settle. Upon this point of legal theory the law has never wavered. 2 *Street, supra,* 69, "If a person chooses to make an extravagant promise for an inadequate consideration, it is his own affair." *Holdsworth, Hist. Eng. Law,* 17; *Sturlyn v. Albany, Cro. Eliz.* 67. It is well settled that a detriment suffered by the promisee at the promisor's request and as the price for the promise is

sufficient, though the promisor is not benefited. 1 *Williston, supra, Sec.* 102. A mere expectation or hope of benefit is sufficient. *Collins v. Hutchins,* 2 *Penn.* 496, 47 *A.* 1004; *Garrow v. Davis,* 15 *How.* 272, 14 *L. Ed.* 692; 13 *C. J.* 318.

 In cases such as the one under consideration the natural question is, were the requirements of registration and attendance in the lobby or outside the theatre at a particular time mere incidental or friendly detriments, not intended as ingredients of a bargain, or were they a bargained for consideration? 1 *Williston, supra,* § 101. Consideration must not be confounded with motive; yet it is the essence of a consideration that, by the terms of the agreement, it is given and accepted as the motive or inducement of the promise. *Holmes, supra,* 293; *Wisconsin & Mich. R. Co. v. Powers,* 191 *U. S.* 379, 24 *S. Ct.* 107, 48 *L. Ed.* 229.

Motion picture theatres are not charitable enterprises. In holding out offers of an award of the kind and in the manner disclosed by the contract, they are not moved by a spirit of brotherly love, sympathy for the poor to the end that they may enjoy a more abundant life, or warmth of heart in any degree. With them it is a cold-blooded business device, embraced with hope and expectancy of filling their theatres with paying patrons. They proceed upon the notorious fact that there is nascent in the human breast a gambling instinct; that the average human is avid of an opportunity to gain much at a small risk; and that this instinct and passion is likely to blossom upon slight nourishment. They know that this spirit is with the old and young, the weak and strong, without regard to sex. So, building their faith upon well known human traits, they confidently offer the opportunity to all persons who will register and attend at or in the theatre, well knowing that many of those who are attracted by the offer will purchase tickets of admission, not only to avoid the physical fatigue incident to standing in the lobby or adjacent street, and the discomfort

arising from weather conditions or a jostling crowd, but also to see the picture displayed, seated in comfort and secure in the knowledge that they are present to see the drawing of the prize and prepared to declare their presence promptly if fortune should smile upon them. The gambling instinct is aroused; and it is intensified if, according to the scheme, the person whose number is called is not present, and the amount of the award is added to that of the next drawing. The prize grows in size. The attendance increases. The theatre prospers; and greed, envy and other evils inherent in lotteries are encouraged.

The deceit in schemes of this nature lies in the pretense of allowing free participation, but at the same time surrounding the opportunity with conditions calculated upon a knowledge of human characteristics to induce those attracted by the offer to purchase tickets of admission to the theatre. Looking behind the pretense, and disregarding legalism, nothing is given away. All of the prizes, disarmingly called gratuities, are supported by a mass contribution. The opportunities to participate in the drawing are paid for collectively by the general body of paying patrons, even though individual participants may not pay; and the fund, out of which the prize money and the profits of the theatre come, is created thereby. *Willis v. Young et al.,* (1907) 1 *K. B.* 448.

Every element of consideration is present in the plan or scheme, suavely called a legitimate advertising means, if outward appearance is penetrated. The requirements of registration and attendance in the lobby or outside of the theatre at a fixed hour, are not mere incidental or friendly detriments not intended as ingredients for a bargain. They are not, as is eagerly urged, only conditions for a gratuitous promise. They are acts essentially bargained for, with the well founded expectancy of profit to the user of the scheme.

■ ■ The courts recognize the existence of ordinary instincts, passions, emotions and motives which universally, in a greater or less degree, influence the actions and conduct of mankind. 1 *Jones Ev.*, § 129. The essential purpose of the rules of judicial notice is to relieve the party from the proof of facts which are so notorious as not to need proof. 5 *Wigmore Ev.*, § 2583. Judges are not necessarily ignorant in court of what everybody else, and they themselves out of court, are familiar with; and there is no reason why they should pretend to be more ignorant or unobserving than the rest of mankind. 15 *R. C. L.* 1057, *et seq.; Henry County v. Salmon*, 201 *Mo.* 136, 100 *S. W.* 20; *City of Wink v. Griffith Amusement Co.*, 129 *Tex.* 40, 100 *S. W.* 2d 695; *Iris Amusement Corporation v. Kelly*, 366 *Ill.* 256, 8 *N. E.* 2d 648.

■ As may be supposed, in a country of many jurisdictions and diverse philosophies, the authorities are not in complete harmony; but the decided weight of authority is in accord with the holding that, as related to a scheme in the nature of a lottery, consideration need not consist in money or something of actual pecuniary value, but may consist in an act done at the request of the proprietor of the scheme if, upon a reasonable and realistic view, the act is bargained for.

It is unnecessary to review the cases. Among them are *Willis v. Young et al., supra; Bader et al v. Cincinnati*, 21 *Ohio Law Rep.* 293; *State v. Danz*, 140 *Wash.* 546, 250 *P.* 37, 48 *A. L. R.* 1109; *Society Theatre et al. v. Seattle*, 118 *Wash.* 258, 203 *P.* 21; *State v. Fox Kansas Theatre Co.*, 144 *Kan.* 687, 62 *P.* 2d 929; 109 *A. L. R.* 698; *Cole v. State*, 133 *Tex. Cr. R.* 548, 112 *S. W.* 2d 725; *City of Wink v. Griffith Amusement Co., supra; State v. Dorau*, 124 *Conn.* 160, 198 *A.* 573; *Iris Amusement Corp. v. Kelly, supra; State v. Fox Beatrice Theatre Corp.*, 133 *Neb.* 392, 275 *N. W.* 605; *State v. McEwan (Mo. Sup.)* 120 *S. W.* 2d 1098; *Jorman v.*

*State*, 54 *Ga. App.* 738, 188 *S. E.* 925; *Barker v. State*, 56 *Ga. App.* 705, 193 *S. E.* 605; *Maughs v. Porter*, 157 *Va.* 415, 161 *S. E.* 242; *State v. Wilson*, 109 *Vt.* 349, 196 *A.* 757. See generally *Williams, Flexible Participation Lotteries; Thomas, Lotteries, Frauds and Obscenity in the Mails*, 35.

In some states it is held that profit accruing remotely and indirectly to the promisor of the prize is not a valuable consideration as related to a scheme in the nature of a lottery. This view is predicated upon the reasoning that consideration as related to a lottery must consist of money, or something of a pecuniary nature or economic value. *State v. Hundling*, 220 *Iowa* 1369, 264 *N. W.* 608, 103 *A. L. R.* 861; *Yellow-stone Kit v. State*, 88 *Ala.* 196, 7 *So.* 338, 7 *L. R. A.* 599, 16 *Am. St. Rep.* 38; *Cross v. People*, 18 *Colo.* 321, 32 *P.* 821, 36 *Am. St. Rep.* 292; *City of Roswell v. Jones*, 41 *N. M.* 258, 67 *P.* 2*d* 286, 287, see dissenting opinion of *Sadler, J.; People v. Cardas*, 137 *Cal. App. Supp.* 788, 28 *P.* 2*d* 99; *Com. v. Wall* (*Mass.*) 3 *N. E.* 2*d* 28; *People v. Shafer*, 160 *Misc.* 174, 289 *N. Y. S.* 649; *Id.*, 273 *N. Y.* 475, 6 *N. E.* 2*d* 410, by a divided court. In *State v. Eames*, 87 *N. H.* 477, 183 *A.* 590, the court, strangely enough, was of opinion that violation of the lottery law was shown only when the State could prove that the scheme, Bank Night, resulted in the payment, in the great majority of cases, of something of value for the opportunity to participate.

With the greatest deference to this philosophy the conventional view of a consideration is permissible. Generally, there is nothing in the scheme known as Bank Night to arouse the concern of courts to such degree as to demand the strictest possible view to be taken of consideration as an element of a lottery scheme. It contains the same mischief as the common place lottery. It is disguised by a thin coating of respectability; and, that the promoters of the scheme know of its inherent evils, is shown by the fact, that by their own rules, persons under eighteen years of age are

not allowed to participate in the drawing. Drawing aside the veil of outward appearance, it is readily enough seen that Bank Night is a scheme conceived in deception having the guise of legitimate advertising. It is based on profit at the expense of the gullible chance taker, and, no doubt, its profits have been tremendous. It pretends to offer a gratuity, whereas, in fact, what is offered is a prize paid out of the funds produced, in part at least, by the scheme itself. It pretends to offer to the theatre proprietor something so entirely within the protection of the law that the licensor has the sole right to use the name, Bank Night, as a trade mark, a pretense denied in *Affiliated Enterprises v. Gantz,* (10 *Cir.*) 86 *F. 2d* 597, and *Affiliated Enterprises v. Gruber,* (1 *Cir.*) 86 *F. 2d* 958; and the very contract declared on suggests that the scheme enjoys the protection of the copyright laws, an assumption denied in the last mentioned case.

 ██ If the statute did no more than denounce lotteries in general terms, the scheme would come within the denunciation. That it is a scheme in the nature of a lottery within the comprehension of the statute is not doubtful; for, no matter what a particular view of a consideration as related to a lottery may be, it is entirely clear that the Legislature meant to ban all schemes, and devices of a gambling nature, whether the consideration be money or price actually paid in a conventional sense, or a more technical form of consideration consisting of an act done by the promisee at the request of the promisor, in circumstances evidencing a reasonable expectancy of profit accruing to the promisor as a result of the act. This is demonstrated by the very language of the statute. It comprehends all schemes in which numbers or tickets, either "disposed of", or actually sold, whether purchased in the conventional sense or merely held, shall upon the happening of a contingency "in the nature of a lottery" entitle the "purchaser" or "holder" thereof to receive money or

property. In the light of the language of the statute, a strained and unusual conception of consideration as related to a lottery has no place.

The contract declared on is an illegal contract, in the enforcement of which the Court will not assist.

RICHARDS and SPEAKMAN, JJ., concur.

RODNEY, J., concurring:

Having arrived at the same conclusion reached by the CHIEF JUSTICE, but upon a somewhat different reasoning, I shall briefly give the basis of my concurrence.

I do not base my conclusions upon thought of those possible winners of the prize who have paid no admission fees to the theatre but find the consideration for the lottery in those potential winners who have in fact paid admission fees which provided all of the prizes.

I shall not attempt to reconcile the cases pertinent to "Bank Night" for they are in irreconcilable conflict and upon facts almost identical with the case at bar. I shall not even pause for the citation of the cases, for they are largely collected in exhaustive notes in 48 *A. L. R.* 1115; 57 *A. L. R.* 424; 103 *A. L. R.* 866; 109 *A. L. R.* 709; 113 *A. L. R.* 1121.

The plaintiff has strongly relied upon the case of *Commonwealth v. Wall*, (*Mass.*) 3 N. E. 2d 28, 29, which he says "embodies the true rule upon the entire subject." That case while properly holding that in a lottery there must be the three elements of prize, chance and consideration said "one may give away his money by chance, and if the winner pays no price, there is no lottery." In that sentence there is both a legal truth and a fundamental error. Of course it is true that "one may give away his money by chance" but in the statement "if the winner pays no price, there is no lottery" there is an erroneous statement of a principle that I think

is fundamental in the present case. I think a lottery may exist even when the winner has paid no price provided that a price, a consideration, has been paid by a substantial part of the potential winners—even though these may, in fact, subsequently prove to be losers.

I am aware that there are a number of authorities which indicate that a consideration must be paid by the winner of a lottery. So in *State v. Hundling,* 220 *Iowa* 1369, 264 *N. W.* 608, 609, 103 *A. L. R.* 861, it is said "he who has the chance to win the prize must pay * * * for that chance." I think that statement is too broad and that it is sufficient if some (not all) shall pay, who have a chance to win.

I have found no case holding that the "winner of a lottery must pay a price" where that was the direct question involved but such has appeared as a dictum in some general statements.

*Com. v. Wall, supra,* cites a number of cases holding the true principle that a game does not cease to be a lottery because some or even many are admitted free, as long as others pay for their chances.

*Glover v. Malloska,* 238 *Mich.* 216, 213 *N. W.* 107, 52 *A. L. R.* 77; *Featherstone v. Independent Service Station Ass'n,* (*Tex. Civ. App.*) 10 *S. W. 2d* 124; *State v. Eames,* 87 *N. H.* 477, 183 *A.* 590.

It is inconceivable that in this State 100,000 lottery tickets can be issued, of which 99,000 could be sold and 1,000 given free, and that the authorities would be powerless to stop the transaction until it was determined which ticket had won. It would be monstrous to hold that if a free ticket won the prize there had been no lottery, but if a ticket which had been sold was the successful ticket that then there had been a lottery. Such must be the ruling if it be true that "if the winner pays no price there is no lottery."

*State v. Eames,* 87 *N. H.* 477, 183 *A.* 590, and *Com. v. Wall (Mass.)* 3 *N. E.* 2*d* 28, are both relied upon by the plaintiff and both involve facts almost identical with the case at bar. In the *Eames* case there was no substantial discussion of the effect of the payment of admissions by a large part of the participants and it was found that "free participation is a reality" [87 *N. H.* 477, 183 *A.* 592] and that the scheme did not constitute a lottery. In *Com. v. Wall,* the Court, while approving the *Eames* case, held that "free participation" was a matter of fact to be determined by a jury.

I think "free participation" is no issue in the case and has nothing whatever to do with the matter unless it be "free participation" of all or substantially all of the potential or possible winners of the scheme.

I think the question in this and similar cases is whether there has been a "participation" which has not been "free" and, if so, whether this "paid participation" has not, in fact, furnished the prizes for the lottery or a portion of them.

Let us for a moment consider, not the case of those who may have had "free participation," but of those who have had a "paid participation."

The admitted object of "Bank Night" is increased attendance at the theatre; increased attendance means increased profits; a portion of the profits is given as the prize; the prize is provided solely by those who pay admissions and many of these are registered as participants in the drawing.

The case, being one of contract, the declaration set out the full details of the operation of "Bank Night." The demurrer raised the question of the illegality of the contract as constituting a lottery. The plaintiff has contended

that the question as to whether or not the scheme is a lottery should not be determined on the demurrer but as a matter of fact after submission to a jury. As I have heretofore shown all of the profits come from paid admissions and a portion of the profits is given as a prize, hence those who have paid admissions have in reality given the prize. I see no question of fact for submission to the jury unless it be the question whether or not it was contemplated that one who had paid admission to the theatre was eligible to register and thus to win the prize. There is of course no doubt as to that question and it is so void of reality that I do not hesitate to decide that question upon the demurrer.

I think that when one pays admission to the theatre on "Bank Night" he, of course, pays for his ordinary right to see the performance but, in addition, is paying for substantial portions of the operation of the Bank Night scheme. His admission fee provides (1) his proportionate part of the prize to be given; (2) greater opportunity of hearing the winner announced; (3) greater opportunity of presenting himself (if a winner) within the limited time allotted for appearance; (4) the opportunity of having a seat and comfort while waiting for the drawing; (5) the avoidance of the crowd and weather outside; (6) the avoidance of an appearance of cheapness and a desire to pay for the privilege of a chance of winning the prize. All of these are provided by the admission money furnished by the "paid participants." What is more important, however, is the effect upon the management of the theatre for he it is, if anyone, who is concerned in an arrangement in the nature of a lottery. He has taken the admission money of the "paid participant" and furnished all of the advantages as above enumerated but, above all, he has appropriated a portion of the admission money to the prize itself.

The case of *Willis v. Young*, (1907) 1 *K. B.* 448, is exactly in line with the thoughts herein expressed. There

gratuitous medals were issued bearing numbers. From these numbers drawings were made and winner published in a newspaper. Medals were never sold with the paper and it was not necessary to buy a paper either to have a medal or ascertain the winner. Lord Alverstone said:

"The money for the prizes, however, comes out of the receipts of the respondents and these, in their turn, come to a considerable extent, from the people who buy the paper * * *. The persons who receive the medals therefore contribute collectively (though each individual may not contribute) sums of money which constitute the fund from which the profits of the newspaper, and also the money for the prize winners in this competition, come * * *".

Justice Darling said:

"In the present instance all chances are paid for in the mass by the general body of purchasers of the paper, although an individual may not pay for his chance. The person who distributes the chances is therefore paid if the sale of the newspapers be looked at as a whole, although some chances may be given away."

Justice Darling added:

"But I wish it to be clearly understood that I am not prepared to hold that an absolutely free and gratuitous distribution of chances, none of which have been paid for, would be a lottery."

Under the conditions suggested by Justice Darling, I would, of course, agree with him and not be prepared to hold such scheme a lottery. Because, in the present case, I am of the opinion that the paid admissions were to be made by a large part of the registered persons who might win the prize, and that these admissions provided the prizes in their entirety, I think the scheme is a lottery and the contract is unenforceable.