IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

PREFERRED FINANCIAL            )
SERVICES, INC.,                )
                               )
            Plaintiff,         )   C.A. No. N16J-05369
                               )
                               )
      v.                       )
                               )
                               )
A & R BAIL BONDS LLC and       )
RODNEY BURNS                   )
                               )
            Defendants.        )
                               )

## ORDER

Andrew G. Ahern, III, Esquire, Joseph W. Benson, P.A., Attorney for Preferred Financial Services, Inc.

Brian T.N. Jordan, Esquire, Jordan Law, LLC, Attorney for A&R Bail Bonds, LLC and Rodney Burns

This 26th day of January, 2018, upon consideration of the record before the Court, the Evidentiary Hearing, and the parties' closing arguments, the following is my findings of fact and conclusions of law.

## BACKGROUND AND PROCEDURAL HISTORY

What started as a simple business loan dispute involving a clear confession of judgment provision, unpredictably morphed into a complicated panoply of issues involving conspiracies and felony crimes. This matter came before the Court upon the filing of a Complaint for Confession of Judgment (Trans. ID# 59184191) by Preferred Financial Services, Inc. ("PFSI") pursuant to Superior Court Civil Rule 58.1. On June 23, 2016, along with the Complaint, PFSI filed a Notice of Entry of Judgment (Trans. ID# 59194331) and sought to confess judgment pursuant to a Demand Promissory Note (the "Note"). The filing is supported by an Affidavit of Amount Due executed by Edwin Swan ("Swan") and sought $124,657.00 in principal, plus interest, attorney fees and court costs. PFSI also presented a copy of the Note as well as the Business Loan Agreement (the "Agreement"),[1] outlining the

---

[1] The parties stipulated to the genuineness of the Note and Agreement and they were offered as joint exhibits for the Court's consideration and marked as Exhibit 1 and Exhibit 2 respectively.

parties' business arrangement. On August 19, 2016, an order was entered granting the relief requested by PFSI (Trans. ID# 59448290).

Defendants, Rodney Burns ("Burns") and A&R Bail Bonds LLC ("A&R"), subsequently moved to vacate the judgment (Trans. ID# 59674348). After a hearing on January 20, 2017, the Motion to Vacate was granted (Trans. ID# 60116813) and the matter was set for an Evidentiary Hearing that began on June 29, 2017,[2] and after a brief recess, concluded on August 3, 2017.[3] Defendants contested the confession of judgment on the bases that (1) the confession of judgment provision is unconscionable and the entire agreement is void as a matter of law; and (2) the amounts set forth as due and owing are incorrect. The record is now complete and I make the following findings of fact and conclusions of law.

## FINDINGS OF FACT[4]

This dispute revolves around a Note entered into by and between A&R, as borrower, and PFSI, as lender. However, in addition to signing the Note as Managing Member of A&R, Burns executed the Note as "Guarantor."[5] The Note is

---

[2] The Transcript can be found at Trans. ID# 6087118 and will hereinafter be referred to as "June Trans. at p. _____."

[3] The Transcript can be found at Trans. ID# 61384429 and will hereinafter be referred to as "Aug. Trans. at p. _____."

[4] These findings are based upon my review of the Exhibits admitted into evidence as well as consideration of the testimony presented by Swan and Burns.

[5] Note at p. 2.

3

described as a Revolving Line of Credit with a principal amount of $100,000.00. Along with the Note, A&R and PFSI entered into the Agreement, that was to begin effective February 20, 2014. According to the Agreement, the loan proceeds were to be used "solely to post property bails (as such term is defined by 18 Del. C. §4332, as amended or replaced from time to time) for Borrower's customers."[6] The purpose of the loan was to facilitate PFSI's advancement of funds to A&R to assist it with the posting of cash bails. A&R was a licensed bail bonds company and could not meet all of its business obligations without the help of PFSI. In exchange, PFSI was to be compensated for its costs and expenses by collecting an origination fee of 13% of each "Advance" and prepaid interest of 2% of each Advance, plus an annual fee in the amount of $300.00.[7] An "Advance" is defined as "a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement."[8]

I considered the conflicting testimony of the witnesses and find that neither witness was entirely credible. Where the positions diverge, I have outlined the testimony of each representative. Swan testified that PFSI provides loans and

---

[6] Agreement at p.3, paragraph 5(i). *See also* Aug. Trans. at pp. 8-9.

[7] Agreement at p.5, paragraph 11.

[8] Agreement at p. 6, paragraph 14(a).

4

funding for commercial businesses.[9] The relationship with Defendants dates back to 2011 when Swan operated his business affairs under the name of a different entity. Sometime in late 2012, or early 2013, the parties continued to do business, now through PFSI, but it was more of a "hand shake" relationship.[10] In February 2014, they documented the business dealings. Swan testified the Note and Agreement evidenced a line of credit intended to consolidate old debt, bring arrears up to date, and start anew.[11] Swan then presented a spreadsheet outlining the history of advancements from PFSI to Defendants.[12] Although recognizing the limiting language within the loan documents, Swan testified that the relationship evolved and some funds were provided for the benefit of the Defendants that were not bail postings.[13] However, Swan also contradicted himself and testified that the Advances correlated solely to bail and Defendants were not to take an Advance for other purposes.[14] And, although Swan testified that past debts were to be rolled into this

---

[9]  June Trans. at p. 27.

[10]  June Trans. at pp. 28, 32.

[11]  June Trans. at p. 34.

[12]  The Spreadsheet was admitted as hearing Exhibit 3.

[13]  June Trans. at pp. 33-34.

[14]  Aug. Trans. at p.15.

new line of credit, he also admitted that some of the debt was for money that was not covered by an agreement with PFSI.[15] Furthermore, some debts were admittedly owed to Swan and his wife, not PFSI, pursuant to a "verbal" agreement with no evidentiary support.

The parties differ in their interpretation of the events that conspired, but the stories reconciled to an extent and the relationship generally proceeded as follows.[16] Burns would approach Swan and request an Advance to post a cash bond for a criminal defendant. Burns would either directly access a joint bank account to draw the funds or Swan would have the funds deposited into an account for the benefit of the Defendants.[17] Swan, on behalf of PFSI, would require documentation of the posting of the bond, monitor all cases and track the status of the bond. If the criminal case was resolved, Swan would notify Burns to go pick up the check from the court, and when he returned to the PFSI offices, Burns was to pay PFSI the full amount of the bond.[18] As discussed above, PFSI was also to be compensated for advancing the funds.

---

[15] Aug. Trans. at pp. 20-21.

[16] *See* Aug. Trans. at pp. 12-13 and 36-38.

[17] June Trans. at p. 33.

[18] June Trans. at pp. 33, 65-67.

6

It is undisputed that neither PFSI, nor Swan, is a licensed bail bondsman or producer in Delaware.[19] As a result, during the cross-examination of Swan at the initial hearing, counsel for Defendants began to explore a line of questioning that could have involved Swan incriminating himself. The issue raised by Defendants was that PFSI's receipt of a percentage of more than 10% of the bails could be punishable under 18 Del. C. §4354. Therefore, before resuming testimony, the Court temporarily suspended the proceedings to allow the parties an opportunity to consult with counsel regarding any potential criminal liability and their rights with respect to the proceedings.[20] The hearing continued on August 3, 2017 at which time the Court confirmed that the parties had consulted with counsel and the parties were ready to proceed.

Burns then testified that his relationship with Swan was more of a "partner" then a "lender" and that the Agreement was entered into solely in response to new regulations issued by the Department of Insurance, *i.e.* that only a licensed bail bondsman could post cash bails.[21] Burns believed the Agreement was a way to help Swan get around these rules. Although the Department of Insurance regulations

---

[19] June Trans. at pp. 63-64.

[20] June Trans. at pp. 71-80.

[21] Aug. Trans. at pp. 40-41.

7

provide that only a licensed bail bondsman that interviews a defendant can post the bond, A&R posted bails for Swan without having met the defendant.[22] In other words, Burns alleges that he and Swan "conspired to violate the insurance laws of the State of Delaware."[23]

An example of how the relationship worked shows the importance of the value exchanged and the interplay with the insurance statutes. In a typical situation, if the cash bail was $10,000.00, the family would pay 30% to A&R or $3,000.00. A&R would then be expected to pay $1,500, or ½ to PFSI.[24] PFSI/Swan would give A&R $10,000.000 and the $10,000.00 cash bail would be posted by Burns with the court. Upon release by the court, the bond would be returned to PFSI.

Burns testified that he routinely paid between 15-18% of each bond to Plaintiff and 2% of every bail was considered part of a "BUF" that he would retain at the end of the relationship.[25] A "BUF" or "build up fund" account, is created when a portion of each bail is set aside to pay any forfeiture ordered.[26] This is frequently done with

---

[22] Aug. Trans. at pp. 59-60.

[23] Aug. Trans. at p. 57. When asked about proof of the conspiracy, Burns responded: "I guess this is proof right here. These are the bails that we done. We did these bails. Pretty much all of them were illegal that we done." *Id.*

[24] Aug. Trans. at pp. 44-45.

[25] Aug. Trans. at pp. 46-48.

[26] Aug. Trans. at pp. 16-17.

insurance companies. When the lending relationship ends, and any outstanding cases are over, the BUF account is returned to the bail bondsman. The BUF covers the risk taken by the bail bondsman that the defendant may abscond.[27] Burns further testified that the parties shared the responsibility 50/50 for any court ordered forfeiture of bail in the event a defendant absconded.[28] Swan denied that they agreed on arrangements for a BUF or forfeiture sharing.[29]

Burns also testified that Swan frequently initiated some of the bails but would ask A&R to post for him. With respect to several of the names on the spreadsheet, A&R acted as an intermediary, never met the defendant, and had no paperwork or payment from the family.[30] Burns recognized this was "wrong"[31] and when he ran into issues with the Department of Insurance, he claims Swan agreed to take care of his legal expenses.[32] Burns also admits that although some of the bonds were initiated by Swan, Burns sometimes picked up the money from the court and kept it

---

[27] Aug. Trans. at pp. 16-17.

[28] *See* Aug. Trans. at pp. 43, 46-67.

[29] *See* Aug. Trans. at pp. 87, 94-95.

[30] Aug. Trans. at pp. 50-52.

[31] Aug. Trans. at p. 54.

[32] Aug. Trans. at p. 55.

without returning it to Swan or paid it out to a creditor on behalf of A&R. Burns didn't always return these funds to Swan because of the pending lawsuit, he believed he was owed a refund from Swan, and because he believes it was his money to use.[33]

The Note and Agreement are consistent with Burns's version of the transactions, but Swan denied any alleged "conspiracy" to violate the new insurance laws. Rather, Swan contends that the loan agreement was intended to bring the parties' relationship into compliance with the new insurance regulations.[34]

## CONCLUSIONS OF LAW

### Confession of Judgment

The Note contained a clear confession of judgment provision that would, in the normal course of events, allow the Court to simply stop there. If a confession of judgment matter is contested, the courts are to inquire into the validity of the waiver. The plaintiff bears the burden of showing the waiver was knowingly, intelligently and voluntarily made. If the plaintiff carries its burden to prove waiver of notice and hearing, the burden shifts to the defendant to raise defenses at a subsequent hearing pursuant to 10 Del. C. §2306(j).

In examining the waiver, the court will look to the totality of the circumstances including: (i) the defendant's business sophistication and experience with similar

---

[33] Aug. Trans. at pp. 56-57, 77.

[34] Aug. Trans. at p. 93.

documents/provisions; (ii) whether the defendant consulted with an attorney in negotiating the document; (iii) whether defendant took the time to read and understand the terms; (iv) whether defendant had an opportunity and time to review the document; (v) was there a *quid pro quo* in exchange for the provision honored; (vi) where the provision is located within the agreement and whether it was placed in a deceptive manner or obscured; (vii) whether the provision is placed so as to be completely beyond the defendant's contemplation of its purpose and separated from other provisions of the agreement; (viii) whether there was any unfair surprise; and (ix) whether the provision is placed with special attention such as underlined or in bold letters.[35]

Ultimately, at the hearing, A&R did not contest the validity of the confession of judgment provision and did not present evidence to refute a knowing, intelligent and voluntary waiver. The confession of judgment provision is found on page 1, paragraph 10, of the Note. It is within its own paragraph, states "Confession of Judgment" in bold, capital letters, and includes a paragraph that is entirely capitalized, in contrast to the remainder of the Note that, except for headings, is in lower case. In light of this, as well as the lack of evidentiary support indicating A&R

---

[35] *See e.g., Architectural Cabinets, Inc. v. Gaster*, 291 A.2d 298 (Del. Super. 1971); *Cheidem Corp. v. Farmer*, 449 A.2d 1061 (Del. Super. 1982); *Customers Bank v. Zimmerman, et. al.*, 2013 WL 6920558 (Del. Super. Nov. 22, 2013).

11

was unaware of the provision, I initially find that Plaintiff has met its burden to confess judgment against A&R.

However, to the extent PFSI seeks to recover debts it believes are owed to Swan (and/or his wife) personally (not PFSI), that are not documented as debts owed to PFSI,[36] or that were advanced by PFSI for reasons not covered by the Note and Agreement,[37] I find that these debts cannot be recovered by PFSI against the Defendants pursuant to this Confession of Judgment action.[38]

Even if consent is found to be valid though, a defendant may raise defenses that he did not know he had at the time he signed the instrument.[39] The burden now

---

[36] I refer here to the alleged debt for rent and electricity that may be owed to Swan and his wife personally as well as the pre-2014 debt that may not be owed to PFSI. *See* Aug. Trans. pp. 20-21, 27.

[37] I include herein the alleged debts for vehicle expenses and legal counsel fees. *See* Aug. Trans. pp. 25, 28.

[38] The only documentation provided by Plaintiff evidencing the debts owed was the Spreadsheet. No receipts or bank statements or other evidence was presented. I note, and take judicial notice of the fact that, Swan has a history of attempting to recover debts that were not documented as owed to the moving party as well as a history of duplicitous conduct in the preservation and presentment of evidence. *See Preferred Investment Services, Inc. v. T&H Bail Bonds, Inc., et. al.*, 2013 WL 3934992, at *18-20, *26-28 (Del. Ch. July 24, 2013), aff'd 2015 WL 258527 (Del. Jan. 21, 2015); *T&H Bail Bonds, Inc., et. al., v. Preferred Investment Services, Inc., and Edwin Swan*, C.A. No. N14J-01-761, at * 13 (Del. Super. Comm., Aug. 31, 2015).

[39] *Cheidem Corp. v. Farmer*, 449 A.2d 1061, 1064 (Del. Super. 1982).

shifts to the Defendants to establish a valid defense by a preponderance of the evidence. Defendants here argue that they conspired with Plaintiff and Swan to circumvent the insurance laws of the State of Delaware and if true, these acts void the Note and Agreement. Defendants recognize that this is a punishable criminal offense in Delaware. Before addressing this issue further though, the matter of confession of judgment or the personal liability of Burns must be considered.

**Burns as "Guarantor"**

The signature of Burns, with the term "Guarantor," appears on the Note, yet the evidentiary record is devoid of any supporting indicia of liability. Admittedly there is a passing reference to a guaranty from Burns in the Agreement (page 3, paragraph G). The Agreement however, is not signed by Burns personally as "guarantor" and there are no further references to a guaranty from Burns. And, although the Agreement specifically contemplates that there would be "guaranties of the Loans in favor of Lender, executed by the guarantor(s) named below, on Lender's forms," there is no separate guaranty document signed by Burns. Further, although the term "Guarantor" appears on the Note by his name, the preceding (all capitalized) paragraph states that *Borrower* read and understood the provisions of the Note, agreed to its terms, etc. There is no corresponding acknowledgment for the "Guarantor." The confession of judgment provision within the Note also only references the "Borrower's" waiver of rights, and makes no reference to the

"Guarantor." No other evidence was presented at the various hearings, or thereafter, to indicate Burns's intent to be bound personally and individually with respect to the lending arrangement or that he knowingly, intelligently and voluntarily waived his rights to confession of judgment. Therefore, I find that judgment cannot be confessed against Burns personally.

## Unconscionability of Note and Agreement

If this had in fact been a simple loan arrangement, the story would end there, but it does not. The Court must now turn to the legality of the business arrangement. In this proceeding, the Court sits as the finder of fact, weighs the credibility of witnesses and resolves any conflicts in witness testimony.[40] The Court must consider the reasonableness or unreasonableness of the testimony, motives of the witnesses, any bias, prejudice or interest as well as any other circumstances shown by the evidence which affect the believability of the testimony.[41] Upon finding conflicting testimony, the Court will attempt to make one harmonious story by giving credit to the portions of testimony which are worthy of credit and disregarding any portion that is not.[42]

---

[40] *Liberto v. Gilbert*, 2015 WL 9048087, at *2 (Del. Super., Dec. 4, 2015).

[41] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545-546 (Del. Super. 2005), quoting *Dionisi v. DeCampli*, 1995 WL 398536, at *1 (Del. Ch. June 28, 1995).

[42] *Id.*

14

Each of the parties must prove their position by a preponderance of the evidence and the Court shall find in favor of the party that establishes the greater weight of the evidence in their favor.[43] "If the evidence is in even balance in a case then the side having the duty to prove something by a preponderance of the evidence has failed to prove it by such preponderance."[44]

The parties stipulated to, and agreed to, the genuineness and authenticity of the Note and Agreement. PFSI is not a licensed bail bondsman in Delaware. Despite this, PFSI purported to "lend" funds to A&R to post cash bails and in exchange, A&R paid PFSI anywhere from 13-18% of the amount of the cash bail. According to the Note, A&R was to pay all or a portion of the principal and amounts due to PFSI "on demand". Neither the Agreement nor the Note contemplated a monthly minimum payment obligation or other payment arrangement depending on the amount owed. Rather, the evidence shows that once a bail was released by the Court, the *entire bail* was to be returned to PFSI. Swan tracked this process, retained the receipt or paperwork, and maintained an interest in the bail proceeds upon redemption of the bond.

---

[43]  *Liberto v. Gilbert*, 2015 WL 9048087, at *2.

[44]  *Guthridge v. Pen-Mod, Inc.*, 239 A.2d 709 (Del. Super. 1967).

Based upon a review of the Note and the testimony presented on behalf of PFSI, I find that PFSI maintained a "financial interest"[45] in each "Advance" or cash bail posted by A&R. In fact, I find that it is more likely than not that PFSI/Swan used Burns and A&R as a "straw man" to effectuate the issuance of bonds that were either originated by Burns or by Swan himself, or that the parties were acting as partners with respect to the posting of bonds. Swan's own description of the relationship is telling. Swan testified that Burns would obtain an Advance (bond), pay the bond to the court, give the receipt to Swan, who would monitor the case until it was over and ready to be collected. At that time, Burns would collect the receipt from Swan, take the receipt to court, get the money (bond) and "return" it to Swan.[46] The Spreadsheet and Swan's testimony repeatedly refer to bonds as either "returned" or "unreturned."[47] In other words, PFSI's interest in the funds converted from "cash" to a "bond" and the entire bond was to be returned to PFSI. In a typical lending relationship, the lender does not lay claim to the funds in that manner, but rather, the

---

[45] It is reasonable to interpret PFSI's interest as 100% of the bail bond. PFSI presumably would loan the full amount of the bail, and the full amount was to be returned to it.

[46] Aug. Trans. at pp. 12-13.

[47] *See e.g.*, Aug. Trans. at p. 21.

lender claims an interest in the accumulating debt as a whole.[48] PFSI/Swan's unique claim to the bond leads to the conclusion that they were not disinterested and PFSI/Swan retained a financial interest in the bond itself.

Further, after weighing the credibility of the witnesses and considering the reasonableness or unreasonableness of the testimony, to reconcile the conflicts, I find that it is more likely than not that the purpose of the 2% pre-payment was intended to fund a BUF account. I could find no other justification for PFSI to have required a 13% origination fee plus prepaid interest of 2% of each Advance. The parties consistently testified that this type of fund is regularly established within the insurance industry. The separation of the 2% from the 13% can only logically be explained as the parties' intent to mimic this insurance practice. Finally, I find that there would be no purpose in the establishment of a BUF if it were not also the parties' intent to share forfeiture liability. I find that the relationship as outlined by Burns is the only reasonable interpretation of the Agreement. Although one would question why Burns would admit to committing acts that could be punishable as a felony,[49] I do not doubt the veracity of his testimony on this subject.

---

[48] Although the Note provides for payment of the entire debt to be made on demand, Swan's testimony is that each bond was to be returned to him when released by the Court.

[49] Any person found guilty of a violation of this section of the Insurance Code is guilty of a class F felony. 18 Del. C. §4352(b).

17

Having made these findings, I now address the alleged conspiracy to violate the insurance statute. Section 4333(d)(3) of Title 18 of the Delaware Code provides that no licensee (*i.e.* bail bondsman) shall allow a person to acquire or maintain a 10% or greater ***financial interest in*** the bail agent's business ***or any 1 or more bail bonds***, unless the person seeking to acquire such interest is a licensed bail bondsman. In light of the fact that PFSI (through Swan) retained a 100% interest in the cash bails, plus was to be paid at least 13% of each cash bail, and shared the liability of any forfeiture 50/50, I conclude that the arrangement violated 18 Del. C. §4333(d)(3). Although Swan testified that it was his intent to conform to the new insurance laws, the arrangement here is virtually identical to his practices prior to the 2014 code change.[50] And, although Swan was not permitted to issue bonds in Delaware, he worked in concert with Burns to use A&R's bail license to conduct business. Swan was sophisticated and knowledgeable about the bail bondsman industry and attempted to do indirectly what he was not permitted by statute to do directly. When the law changed in January of 2014, the relationship between the parties didn't change, he simply coined a new name for the practice and disguised it as a lending relationship.

---

[50]   *See e.g. Preferred Investment Services, Inc. v. T&H Bail Bonds, Inc., et. al.,* 2013 WL 3934992 (Del. Ch. July 24, 2013).

This Court will not enforce a contractual agreement that is founded upon a violation of the law. "Where parties to a contract are in *pari delicto*, a court will 'leave them where it finds them,' and will refuse to enforce the contract."[51] PFSI argues that even if the Court finds that the contract was illegal, it could still enforce its terms.[52] "Contracts may be unenforceable if they are either illegal *per se* or violate public policy."[53] In making this determination, the court will consider:

> the statute's language, nature, object, purpose, subject matter, reach, the wrong or evil which the law seeks to remedy or prevent, the class of persons sought to be controlled, the legislative history and the effects of holding a contract in violation of the law invalid as well as balancing the interest in enforcement of the contract against the law's underlying public policy.[54]

I have considered the statute's language, nature, object and purpose to be to regulate persons involved in the bail bond business in Delaware. Unlike the case cited by PFSI, this is not a situation of a technical defect within the document. The

---

[51] *Burns v. Ferro*, 1991 WL 53834, at *2 (Del. Super. Mar. 28, 1991) (internal citations omitted). *See also Della Corp. v. Diamond*, 210 A.2d 847, 849 (Del. 1965) (finding illegality of contract cannot be cured by fictitious form of agreement); *Affiliated Enterprises, Inc. v. Waller*, 5 A.2d 257, 259 (Del. Super. 1939) (declining to afford plaintiff relief when agreement is in violation of statute).

[52] PFSI cites *Bunting v. Citizen's Fin. Group*, 2007 WL 2122137, at *5 (Del. Super. Ct. Jun. 29, 2007).

[53] *Id.* (internal citations omitted).

[54] *Id.*

business relationship itself was intended to circumvent the statute in question and PFSI/Swan (as well as A&R/Burns) are within the class of persons sought to be controlled. In the present case, the statute in question was amended by the Delaware General Assembly to curb abuses of the bail bond system and to tighten regulatory oversight in order to control abuses of the system.[55] The arrangement presently before the Court is a substantive manipulation of the statute's prohibitions and is against the very public policy the statute was intended to protect. In conclusion, after examining the contracts at issue here, and scrutinizing the facts and circumstances of this case, it is my determination that the parties' business dealings violate the laws of the State of Delaware and as such, I find that the Note and Agreement are void and unenforceable.[56]

In consideration of the foregoing, I hereby decline to enter any judgment in this matter and will leave the parties as the Court finds them.

IT IS SO ORDERED this 26th day of January, 2018

Commissioner Mayer

---

[55] *See* Del. H.B. 1 as substitute for H.B. 151 syn., 147th Gen. Assem. (Aug. 27, 2013).

[56] *See e.g., In re Fuqua Industries, Inc.*, 2006 WL 2640967 (Del. Ch. Sept. 7, 2006) (voiding contract that conflicted with strong public policy and rules of professional conduct).